

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-20-1995

# Dimuzio v Resolution Trust

Precedential or Non-Precedential:

Docket 95-5066

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Dimuzio v Resolution Trust" (1995). *1995 Decisions.* Paper 276.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/276

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-5066


RICCARDO DIMUZIO; RUTH DIMUZIO,
on behalf of themselves and all
others similarly situated

v.

RESOLUTION TRUST CORPORATION IN
ITS CAPACITY AS RECEIVER OF CARTERET
SAVINGS BANK, F.A. AND IN ITS
CAPACITY AS CONSERVATOR OF
CARTERET FEDERAL SAVINGS BANK
(D.C. Civil No. 94-cv-01559)

RICCARDO DIMUZIO; RUTH DIMUZIO

v.

RESOLUTION TRUST CORPORATION AS
CONSERVATOR OF CARTERET FEDERAL SAVINGS
BANK AND CARTERET SAVINGS BANK
(D.C. Civil No. 94-cv-04800)

KAZUYUKI KAMEDA; TANEKO KAMEDA;
ESMIE J. WINT, on behalf of themselves
and all others similarly situated

v.

RESOLUTION TRUST CORPORATION AS
CONSERVATOR OF CARTERET FEDERAL SAVINGS
BANK AND CARTERET SAVINGS BANK
(D.C. Civil No. 94-cv-04831)

Riccardo Dimuzio, Ruth Dimuzio,
Kazuyuki Kameda, Taneko Kameda and Esmie Wint,

Appellants


On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Nos. 94-cv-01559;


1

94-cv-04800; and 94-cv-4831)

Argued August 25, 1995

Before:   GREENBERG, COWEN and SAROKIN, Circuit Judges

(Filed October 20, 1995)

Douglas S. Lyons (argued)
Lyons & Farrar
201 Alhambra Circle
Suite 711
Coral Gables, Florida 33134

      COUNSEL FOR APPELLANTS

John H. Denton
Connell, Foley & Geiser
85 Livingston Avenue
Roseland, New Jersey  07068

Jeffrey Ehrlich (argued)
Room 3129
Resolution Trust Corporation
Legal Division
1717 H Street, N.W.
Washington, D.C.  20006

      COUNSEL FOR APPELLEE

**OPINION**

COWEN, Circuit Judge.

      This breach of contract and fraud action is brought by real estate owners against the Resolution Trust Corporation ("RTC") in its capacities as receiver for Carteret Savings Bank and as conservator of Carteret Federal Savings Bank.  The district court granted the RTC's motion to dismiss brought

2

pursuant to Fed. R. Civ. P. 12(b)(6).  Because we find that 12 U.S.C. § 1823(e) bars plaintiffs-appellants' cause of action against the RTC, we will affirm the district court's order of dismissal.

## I.

The following facts are alleged in plaintiffs' complaints.  The plaintiffs are the victims of a widespread fraud perpetrated by General Development Corporation ("GDC").  GDC was one of the largest land development companies in Florida.  It primarily sold real estate to out-of-state residents using monthly installment contracts.  GDC's advertisements touted its low down payments and small monthly payments as making the "Florida dream" widely affordable.

After purchasing a GDC lot, GDC customers were encouraged to use the "equity" they had built up in their property as a down payment on a GDC house or condominium.  They were given, among other inducements, roast beef suppers at the local Holiday Inn, flyers portraying the joys of GDC home ownership, and personal attention by GDC sales representatives.  During these sessions, prospective purchasers were told that, after taxes and rental income, the cost of owning a GDC home would be only slightly more than the payments they were making for their vacant lots.

Interested pre-qualified buyers were invited to travel to Florida to visit a GDC community and to choose a home from among numerous GDC models.  The cost of the trip ($299.00) could be applied against the sales price if they purchased a house or

3

condominium. GDC representatives accompanied prospective purchasers from the time they departed for Florida until the time they returned home. While in Florida, they stayed at GDC-selected hotels, dined with GDC personnel, and traveled with GDC sales representatives to GDC communities. The GDC contract to purchase was signed during the trip. Under no circumstances were the purchasers allowed to extend their Florida stay or view other real estate development communities.

In addition to these hard-sell sales tactics, the GDC customers were persuaded to apply for a mortgage from GDC's "designated lender," GDV Financial Corporation ("GDV"). GDV, a wholly owned subsidiary of GDC, was created to finance the purchase of GDC houses, and to sell and service the mortgages. As part of the loan process, GDV had the GDC houses appraised. These appraisals failed to comply with industry guidelines.[0] Instead, the homes were appraised in conformance with GDC's inflated selling price. The houses were highly over-valued, and the mortgages were for amounts far greater than the market value of the real property that secured them. The purchasers did not seek independent appraisals, nor did they retain legal representation in purchasing the real estate.

GDV entered into an arrangement with several institutional investors to sell the mortgages. One of those investors, Carteret Savings Bank ("Carteret"), a federally

[0]Those guidelines are established by the Federal National Mortgage Corporation ("FNMA") and Federal Home Loan Mortgage Corporation ("FHLMC"), respectively the first and second largest purchasers of residential homeowners' mortgages.

4

insured savings & loan, bought the mortgages despite the non-conforming appraisals.  Carteret allegedly was aware of the non-conforming appraisals, and purchased the mortgage loans with certain credit enhancements: it required GDV to obligate itself to repurchase the loans in case of a default, and further required that GDV's performance be secured by letters of credit and cash deposits.

On December 4, 1992, the Office of Thrift Supervision ordered Carteret closed and appointed the RTC as its receiver. On that same date, the assets of the former Carteret were transferred to Carteret Federal Savings Bank, a newly chartered federal savings association, and the RTC was appointed conservator of the new bank.

Following an investigation, GDC as well as its directors were indicted and convicted of criminal fraud and conspiracy to commit fraud.  Both GDC and GDV filed for protection under Chapter 11 of the Bankruptcy Code.  GDC emerged from bankruptcy as Atlantic Gulf Communities Corporation and GDV was dissolved.

GDC customers Riccardo and Ruth Dimuzio filed an action in the United States District Court for the District of Columbia against the RTC as conservator of Carteret Federal Savings Bank and Carteret Savings Bank.  Kazuyuki Kameda, Taneko Kameda and Esmie Wint filed a class action against the RTC on behalf of those persons who obtained mortgage financing from GDV in the United States District Court for the District of Columbia.  These actions were transferred to the United States District Court for

5

the District of New Jersey, and consolidated by order of the district court on October 19, 1994.

Each complaint alleged, inter alia, breach of fiduciary duty, breach of contract, fraudulent concealment, mortgage fraud, and unfair and deceptive trade practices. Plaintiffs allege that GDV knew and failed to disclose that: (1) the loan arranged would result in the purchasers losing their cash equity in the lot they traded in; (2) the GDV appraisal of the housing unit was inaccurate and did not conform to industry standards; (3) no lender applying industry standards would accept the GDV appraisal or make a purchase money loan in the amount requested; and (4) GDV, because of its GDC-controlled status, had a conflict of interest and did not intend to negotiate a conventional arms-length loan as requested by the purchasers in their loan applications. Plaintiffs further allege that Carteret knew or should have known of GDC's and GDV's concealment of material facts upon which the notes were secured.

The district court dismissed the complaints pursuant to Fed. R. Civ. P. 12(b)(6), holding that plaintiffs' causes of action were precluded by Adams v. Madison Realty & Development, Inc., 937 F.2d 845 (3d Cir. 1991) and 12 U.S.C. § 1823(e).[0] This appeal followed.

---

[0] Although the RTC advanced a number of grounds in support of its motion to dismiss, the district court relied upon § 1823(e) to decide the motion. On this appeal, the RTC seeks an affirmance on this statutory basis. Accordingly, our discussion is limited to § 1823(e), and we need not apply the federal common law doctrine of D'Oench, Duhme. Indeed, we note that the D'Oench, Duhme doctrine may no longer be a separate bar to plaintiffs'

6

## II.

The district court had jurisdiction over this case under 12 U.S.C. § 1441a(*l*)(1) and 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. This is an appeal from the district court's dismissal of the plaintiffs' complaints pursuant to Fed. R. Civ. P. 12(b)(6). Accordingly, our review is plenary. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993).

## III.

The Federal Deposit Insurance Act of 1950 includes a provision, 12 U.S.C. § 1823(e), which is generally thought to codify the result reached in D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S. Ct. 676 (1942). See Adams v. Madison Realty & Development, Inc., 937 F.2d 845, 852 (3d Cir. 1991)(citing FDIC v. Blue Rock Shopping Center, Inc., 766 F.2d 744, 745 (3d Cir. 1985)). Section 1823(e) provides:

> No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it ... either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement --
>
> (1) is in writing,
> (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
> (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

---

claims. See, O'Melveny & Myers v. FDIC, __ U.S. __, 114 S. Ct. 2048 (1994); Murphy v. FDIC, 61 F.3d 34 (D.C. Cir. 1995).

7

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

One purpose of this section is to permit federal and state bank examiners accurately and quickly to assess the financial condition of a federally insured depository institution by examining its books and records. The statute accomplishes this objective, in part, by limiting the enforceability of "agreements" affecting the institution's assets held by the receiver to those that are properly recorded in the books and records of the institution. See Langley v. FDIC, 484 U.S. 86, 108 S. Ct. 396 (1987).

A second purpose of § 1823(e), implicit in its requirement that the agreement be executed "contemporaneously" with the acquisition of the asset and approved by officially recorded action of the bank's board or loan committee, is to "ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." Langley, 484 U.S. at 91, 108 S. Ct. at 401.

The Supreme Court has construed the word "agreement" broadly in the context of § 1823(e). In Langley, the plaintiffs purchased real estate from a federally insured bank and were obligors on an unconditional promissory note. When the bank sought to collect on the note, the Langleys sued to avoid payment, claiming that the bank had made misrepresentations

concerning the value and amount of the real estate at issue. After the bank failed, the FDIC was substituted as a party.

The Langley Court held that § 1823(e) bars a claim of fraud in the inducement when an obligor seeks to avoid payment on a note that has come into the FDIC's possession. The Court reasoned that for purposes of the statute, the term "agreement" includes warranties concerning real estate, the truthfulness of which is a condition precedent to the Langleys' obligation to pay the note. Because this "agreement" had not been recorded on the bank's records, the Court held that the defense of fraud in the inducement was statutorily barred.

In Adams, 937 F.2d at 845, we held that § 1823(e) extends to any warranty on which a party's performance is conditioned, and is not limited to obligations made between a bank and its obligor. In Adams, the plaintiffs had executed promissory notes for investments in fraudulent tax shelters. Although each of the notes was payable to one of three originator banks, the notes were eventually purchased on the secondary market by Empire of America Federal Savings Bank, a federally regulated savings and loan. The RTC was appointed as conservator of Empire and came into possession of the notes. The Adams court held that plaintiffs had not made the agreement, i.e., representations and warranties related to the fraudulent tax shelters, part of the official bank record. Thus, the requirements of § 1823(e)(3) were not satisfied.

The Adams court specifically rejected the plaintiffs' claim that § 1823(e) was inapplicable in cases where the obligors

had no direct dealings with a federally regulated depository institution:

> *Langley* makes it clear that the "agreement" covered by § 1823(e) and the *D'Oench* doctrine extends to any warranty on which a party's performance is conditioned. There is absolutely no indication that the Court's reasoning should be limited to obligations between a bank and its obligor.

*Adams*, 937 F.2d at 858. Therefore, § 1823(e) applies to agreements between an obligor and parties other than a depository institution.

### A.

A threshold question exists in this case as to what is the "agreement" that diminished or defeated the interest of the RTC in its acquisition of the subject promissory notes. Appellants contend, and the district court found, that the "agreement" sought to be enforced is the home appraisals and the Loan Purchase Agreements between GDV and Carteret. The district court concluded that the "agreement" in the form of the Loan Purchase Agreements and the appraisals met the "in writing" requirement of § 1823(e)(1).

Although the appraisals may be evidence of the alleged fraud, they are not a written form of the representations and warranties regarding the real estate, the truthfulness of which is a condition precedent upon which the plaintiffs base their claims. Specifically, the appraisals were not a bargained for promise or warranty that the real estate was priced at market value. See, *Langley v. FDIC*, 484 U.S. at 91. ("agreement" under

10

§ 1823(e) is a warranty or a promise which imposes duties or conditions.).  Similarly, the Loan Purchase Agreements did not diminish the interest of the RTC; nor were the plaintiffs parties to these agreements.  Accordingly, we reject the district court's conclusion that the "agreement" in this case is the appraisals and Loan Purchase Agreements.

Representations and warranties regarding the real estate, the truthfulness of which was allegedly a condition precedent to the plaintiffs' obligations to repay the notes, would constitute an "agreement" that diminishes the interest of the RTC.  There are no allegations that such an "agreement" was put in writing.  Therefore, the agreement in this case does not meet the "in writing" requirement of § 1823(e)(1).[0]

## B.

Appellants next assert that because § 1823(e) always would bar a claim in a situation such as the one presented in

---

[0]One purpose of the writing requirement in § 1823(e) is to enable bank examiners to make reliable examinations of the bank's worth. Langley, 484 U.S. at 91.  Judge Sarokin in his dissent maintains that, in this case "the RTC could evaluate the worth of Carteret's assets and examine these appraisals and agreements and indeed, discover the fraud alleged by the plaintiffs." Dissent typescript at 7.  We respectfully disagree.  Plaintiffs' complaints allege that the official bank record included appraisals stating that they were not made in accordance with FNMA/FHLMC guidelines, and that Carteret was aware of this fact when it bought the Loan Purchase Agreements.  We cannot say, based on these allegations, that the official bank record showed on its face that the notes were procured by fraud in the inducement.  Nor can we conclude, as Judge Sarokin does, that these documents put the bank examiners "on notice" of the real worth of the assets.  Dissent typescript at 7-9.

11

this case, we should decline to apply it. The obligors here seek to avoid payment on promissory notes which have been purchased by a depository institution on the secondary market. They claim that such an "agreement" could never be executed by the depository institution and the obligor contemporaneously with the depository institution's acquisition of the asset as required by § 1823(e)(2).

The fact that it is not possible for the representations and warranties made in this case to constitute an "agreement" that meets the contemporaneous requirement of §1823(e)(2), however, does not inextricably lead to the conclusion that Congress did not intend the recording statute to apply in these cases, or that an exception should be carved out of the statute. Adams teaches that § 1823(e) applies to "agreements" between obligors and third parties and, therefore, applies in this case. Adams cannot be overruled except by an in banc court. IOP Chapter 8. Hearing or Rehearing in Banc.

We note that every other court of appeals that has considered this issue has come to the same conclusion as we did in Adams. See Victor Hotel Corp. v. FCA Mortg. Corp., 928 F.2d 1077, 1083 (11th Cir. 1991) (§ 1823(e) does not only apply where the note is initially executed in favor of a bank); Chatham Ventures, Inc. v. FDIC, 651 F.2d 355, 360-61 (5th Cir. Unit B 1981) (§ 1823(e) makes no exception for agreements initiated by a

12

third party and the obligors), cert. denied, 465 U.S. 972, 102 S.
Ct. 2234 (1982).[0]

Appellants contend that Adams is distinguishable
because the representations at issue in Adams were oral, while
the "agreement" here, the Loan Purchase Agreements and
appraisals, was in writing.  As we have determined that the
"agreement" in this case--the representations and warranties made
by GDV and GDC to the plaintiffs--was not in writing, Adams is
not distinguishable on this basis.

Appellants also argue that Adams is distinguishable
because the Adams court affirmed the district court's grant of
summary judgment whereas here the district court granted
defendant's motion to dismiss without giving appellants the
opportunity to discover Carteret's records at the time it
purchased the notes.  This argument must also be rejected.
Accepting, as we must, all allegations of fact as true,
appellants would not be entitled to relief under any state of
facts which could be proven in support of their claims.
Appellants concede the point by arguing that § 1823(e)(2)'s
contemporaneous requirement could not possibly be met under the
facts of this case.

---

[0]Judge Sarokin in his dissent suggests there is an emerging
circuit split on whether the contemporaneous requirement must be
strictly interpreted.  Dissent typescript at 10.  However, the
case upon which he principally relies, RTC v. Midwest Federal
Sav. Bank of Minot, 36 F.3d 785, 797-98 (9th Cir. 1994), did not
involve a note that was purchased on the secondary market.
Moreover, FDIC v. Manatt, 922 F.2d 486 (8th Cir. 1991) expressly
left open the question of the reach and scope of § 1823(e)(2).
Id. at 489 n.4.

Appellants next assert that because of market realities, an obligor whose promissory note is purchased on the secondary market can never execute an agreement contemporaneously with the bank's acquisition of the note, and, therefore, an equitable exception to the statute should apply in this case. They claim that the Adams court did not recognize such an equitable exception because the appellants in Adams knew that they were creating negotiable instruments, whereas here, the appellants did not know their notes were negotiable. This distinction is not dispositive. We agree that Adams raised the issue of the possible availability of an equitable exception to §1823(e). That discussion, however, was dictum included in the opinion after the court had already held that § 1823(e) applied in that case. The Langley Court similarly rejected the availability of an equitable exception after it reached its holding. Langley, 484 U.S. at 96, 108 S. Ct. at 403. We likewise will not carve out an equitable exception.

As the Supreme Court stated in Langley, "Congress opted for the certainty of the requirements set forth in § 1823(e). . . . Such a categorical recording scheme is of course not unusual." Langley, 484 U.S. at 95, 108 S. Ct. at 403. Either the statutory requirements are met or they are not. We cannot ignore the plain language of the statute and binding precedent of our court to reach an arguably more equitable result. If Congress wishes to provide relief to obligors whose promissory notes were procured by fraud and later transferred on the secondary market to a federal insured depository institution, it may amend the statute

14

accordingly.  We have no reason to believe that Congress intended to exempt from the recording statute a situation such as the one presented in this case.[0]

The order of the district court dismissing plaintiffs' complaints pursuant to Fed. R. Civ. P. 12(b)(6) will be affirmed.

---

[0] Judge Sarokin argues in his dissent that the contemporaneous requirement "must be read in light of commercial reality.  When there exists a secondary market for mortgage notes, the original loan and subsequent acquisition will never be precisely contemporaneous."  Dissent typescript at 12.  We agree that it is virtually impossible for an original loan and subsequent acquisition on a secondary market to be made contemporaneously.  We further agree that there is a dearth of legislative history to this statute.  However, it is hornbook law that in interpreting undefined statutory language, we must look to the term's common usage and general acceptance. Hertz Corporation v. United States, 268 F.2d 604, 607 (3d Cir. 1959), aff'd, 364 U.S. 122, 80 S. Ct. 1420 (1960).  "Contemporaneous" means "living, existing or occurring at the same time."  Webster's New Int'l Dictionary 575 (2nd ed. 1959).  Therefore, we respectfully disagree with Judge Sarokin that Congress intended contemporaneous to mean "not precisely contemporaneous."  We conclude that any "agreement" that is not entered into at the same time as the acquisition of the asset fails to meet the contemporaneous requirement of §1823(e)(2).

<u>Dimuzio v. RTC</u>, No. 95-5066

SAROKIN, <u>Circuit Judge</u>, dissenting:

The RTC as receiver accepts an insolvent institution's portfolio in its then-posture. The RTC is entitled to rely upon what it discovers in the records of the institution in evaluating its financial condition and determining what future action to take as a result of that examination. The purpose of § 1823(e) is to avoid subjecting the RTC to claims or defenses not readily apparent from a reasonable inspection of the documents maintained by the insolvent institution in the ordinary course of its business. The RTC, as contrasted to the FDIC, has no discretion to deal with the institution's assets and liabilities other than as it finds them.

Here, the fraud about which plaintiffs complain virtually leaps out from the documents, and it is thus eminently clear that there was evidence that the institution had knowledge and notice of the fraud when it acquired the loans. Clearly if Carteret acquired the loans with such knowledge, it took them subject to the claims and defenses of the defrauded borrowers. The question raised here is whether the applicable statute defeats those claims and defenses if asserted against the RTC. In my view it does not, and thus I respectfully dissent and would reverse.

I.

16

In reviewing this case below, the district court examined the third Loan Purchase Agreement between Carteret and GDV. Dimuzio, et al. v. RTC, No. 94-1559, slip op. at 14 (D.N.J. Nov. 15, 1994). Indeed, the Loan Purchase Agreements between GDV and Carteret are at the center of this case, as they are written documents demonstrating that Carteret was aware that GDV's appraisals were inflated above the fair-market value of the sites and did not conform to the standards of the Federal National Mortgage Association ("FNMA") or the Federal Home Loan Mortgage Corporation ("FHLMC"). In all Carteret entered into three bulk purchase agreements with GDV. As to mortgages issued under GDV's "Lot Trade Program," in which plaintiffs participated, the commitment letter which was incorporated into the third purchase agreement provided:

> Appraisal reports on the housing package and condominiums do not conform to FNMA/FHLMC guidelines. These appraisals are based on prices of comparable units sold by General Development and may not reflect the sales price of similar properties offered by local builders or the resale price of the home in the local market. Accordingly, there can be no assurance that the appraised value can be realized in the event of foreclosure, liquidation or sale of the property.

Appendix ("App.") at 195. Carteret's second bulk purchase agreement and the incorporated commitment letter with GDV contained very similar language. These two agreements also acknowledged that because the appraisals were non-conforming, the loans could not be sold to FNMA or FHLMC.[0]

---

[0] Carteret's first commitment letter with GDV did not state that the appraisals were non-conforming or the reason for this failure, but Carteret did acknowledge "[w]e also understand that these loans are not salable [sic] to FNMA." App. at 179. It is not clear from the complaint whether Carteret purchased

17

II.

The majority's general discussion of 12 U.S.C. §1823(e) and the case law interpreting it, Majority Opinion, typescript at 7-10, is well presented, and I concur in their overall conclusion therein that § 1823(e) is applicable to the mortgages in this case.

A.

The majority correctly concludes that, under Langley v. FDIC, 484 U.S. 86 (1987) and Adams v. Madison Realty & Development, Inc., 937 F.2d 845 (3d Cir. 1991) ("Adams II"), the misrepresentations alleged by plaintiffs in the inflated, non-conforming appraisals of the GDC properties constitute an "agreement" for purposes of § 1823(e). As we set forth in Adams II, "any warranty on which the performance of a party is conditioned is an 'agreement' within the meaning of section 1823(e)." Adams II, 937 F.2d at 853. See also FDIC v. Bathgate, 27 F.3d 850, 862 (3d Cir. 1994) (agreements include "promises to perform acts [and] conditions to the performance of a party's obligation"). Accordingly, we have held that misrepresentations underlying a claim of fraud in the inducement are "agreements" and hence enforceable against the RTC only when they satisfy the four requirements of § 1823(e). Adams II, 937 F.2d at 857. The misrepresentations in GDV's appraisals are thus "agreements" for purposes of § 1823(e).

B.

---

plaintiffs' mortgages pursuant to the first, second, or third agreement.

18

Similarly, I agree with the majority that under Adams II we are constrained to conclude that, although plaintiffs executed the loans with something other than a depository institution, the loans are nonetheless subject to § 1823(e). Adams involved the application of § 1823(e) to a situation where, just as here, the RTC acquired notes initiated by a mortgage company by taking over a failed bank that had purchased the notes on the secondary market. Adams II, 937 F.2d at 850 (citing Adams v. Madison Realty & Development, Inc., 853 F.2d 163, 164-65 (3d Cir. 1988) ("Adams I")). In concluding that it was appropriate to apply § 1823(e) to the agreement in Adams II, we looked specifically to the fact that, even though the loans had been purchased on the secondary market, plaintiffs obligations ultimately ran to the failed bank when the bank acquired plaintiffs' notes. Id. at 858.

The facts of Adams are indistinguishable from those in the instant case for purposes of determining whether § 1823(e) applies, and I thus agree with the majority that § 1823(e) necessarily applies here.

### III.

Unlike the majority, however, I conclude that the home appraisals and Loan Purchase Agreements between GDV and Carteret should be considered as part of the "agreement" for purposes of §1823(e).

In Langley, the Supreme Court held that misrepresentations made by a bank regarding the acreage of land, "the truthfulness of which was a condition to performance of [petitioners'] obligation to repay the loan," constituted an "agreement" for purposes of applying § 1823(e). Langley v. FDIC, 484 U.S. at 90-91. In my view it would be ironic and inconsistent to give a broad meaning to "agreement," so as to incorporate oral representations and warranties, but then exclude written appraisals and loan documents upon which the parties relied in acquiring the loans. Thus, it is difficult to accept, under Langley's analysis, that the written appraisals in this case "are not a written form of the representations and warranties regarding the real estate." Majority Opinion, typescript at __. Just as the petitioners in Langley, plaintiffs accepted loans based on representations by the lender that the plaintiffs now allege to be false. The written non-conforming appraisals in the instant case were acquired by GDV, and were designed to support the selling price of the GDC houses. In providing these appraisals to plaintiffs without disclosing that they were inaccurate and did not conform to industry standards, GDV represented that the properties GDC was selling to plaintiffs were actually worth the appraisal amount -- a condition upon which the plaintiffs relied. The appraisals thus plainly are part of the agreement. Adams II, 937 F.2d at 853 (holding "any warranty on which the performance of a party is conditioned is an 'agreement' within the meaning of section 1823(e)").

20

In addition, in considering the "agreement" to which §1823(e) applies, we must also consider the Loan Purchase Agreements between GDV and Carteret but for different reasons. It is through these Loan Purchase Agreements that Carteret has become the bank to which the plaintiffs are obliged. See Adams II, 937 F.2d at 858 (holding that plaintiffs became obligors to the failed bank that bought their promissory notes on the secondary market). While we held in Adams II that the application of § 1823(e) should not be "limited to obligations between a bank and its obligor," Adams II, 937 F.2d at 858, we also concluded that alternative grounds for applying § 1823(e) also existed -- namely that the transferal of the loans to the failed bank meant that the plaintiffs were the obligors of the bank, and that the statute applied because of that link. This is the exact situation that exists here; the plaintiffs are Carteret's obligors. It is only logical, then, that the documents transferring plaintiffs' obligations to Carteret -- the Loan Purchase Agreements -- be considered as part of the agreement for purposes of applying § 1823(e).

Furthermore, we must remember that one of the principle purposes of § 1823(e) is "to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets." Langley, 484 U.S. at 91 (emphasis added). Indeed, in Adams II, this court examined "the extent [to which the] promises [at issue] were made a part of the bank's official records." Adams II, 937 F.2d at 857 (emphasis added). The contents of Carteret's official records, complete with the Loan

21

Purchase Agreements and the home appraisals, then, are the appropriate subject of the § 1823(e) analysis. It is from these official records that one could find that the RTC could evaluate the worth of Carteret's assets and examine these appraisals and agreements and indeed, discover the fraud alleged by the plaintiffs.[0]

This conclusion is not undermined by the Supreme Court's decision in Langley. There, the Supreme Court ruled that the FDIC's knowledge of a misrepresentation at the time it acquired a note is not relevant to whether § 1823(e) applies. Langley 484 U.S. at 94. The Court reasoned that:

> [h]arm to the FDIC . . . is not avoided by knowledge at the time of acquiring the note. The FDIC is an insurer of the bank, and is liable for the depositors' insured losses whether or not it decides to acquire the note. The harm to the FDIC caused by the failure to record occurs no later than the time at which it conducts its first bank examination that is unable to detect the unrecorded agreement and to prompt the invocation of available protective measures, including termination of the bank's deposit insurance. Thus, insofar as the recording provision is concerned, the state of the FDIC's knowledge at that time is what is crucial.

Id. at 94-95 (citations omitted).

---

[0] Indeed, when considering a motion to dismiss under Rule 12(b)(6), courts are to determine "whether in the light most favorable to the plaintiff, and with every doubt resolved in his behalf, the complaint states any valid claim for relief." 5A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1357, at 332-36. Under such a standard, any doubts as to whether the non-conforming nature of the appraisals put Carteret and the RTC on notice that plaintiffs had been defrauded must thus be resolved in plaintiffs' favor.

In the RTC's context, by contrast, knowledge of a bank's assets is important at the time the RTC acquires them, not before. There are no measures the RTC could take to protect itself before this time, as opposed to the FDIC which could opt not to insure a bank. In this case, the purpose of the recording provision is to apprise the RTC of the bank's assets so it can determine the appropriate course of action, and the RTC looks to the bank's official records in order to do this.

## IV.

Concluding as I do that the "agreement" to be considered here includes the home appraisals and Loan Purchase Agreements, I now look to see whether this agreement meets the four requirements of § 1823(e). I believe that it does.

### A.

In considering whether the agreement meets the "in writing" condition of § 1823(e)(1), we have held that "no agreement between a borrower and a bank which does not plainly appear on the face of an obligation or in the bank's official records is enforceable against the FDIC." Adams II, 937 F.2d at 852. More recently, we "slightly extend[ed]" Adams II to add that, "not only does the existence of the agreement have to appear plainly on the face of an obligation, but the basic structure of that agreement -- its essential terms -- must also appear plainly on the face of that obligation." RTC v. Daddona, 9 F.3d 312, 319 (3d Cir. 1993). See also Bathgate, 27 F.3d at 864.

23

Not surprisingly, in "misrepresentation" cases, plaintiffs have often failed to satisfy the writing requirement. See Langley, 484 U.S. at 89 ("No reference to these representations appears in the documents executed by [plaintiffs]"); Adams II, 937 F.2d at 857 ("Since plaintiffs did not make these promises part of the official records, they are estopped from raising their claims of fraud in the inducement against the RTC"); Daddona, 9 F.3d at 317; Bathgate, 27 F.3d at 865-66. In most instances of fraudulent inducement, it would be rare to find the fraud in the documents themselves. But bearing in mind that the documents must place the RTC on notice, the requirement is sound.

The district court concluded that, in this instance, the writing requirement was satisfied. For reasons I explained above, I believe that the district court correctly looked to Carteret's records and the third Loan Purchase Agreement with GDV, which acknowledged that the appraisals were non-conforming and likely in excess of the fair market value, as well as the appraisals themselves. Dimuzio. et al. v. RTC, No. 94-1559, slip op. at 14 (D.N.J. Nov. 15, 1994). The non-conformity of the appraisals, and importantly the recognition that the appraisals may not reflect the fair market or resale value of the properties, "plainly appear on the face," Adams II, 937 F.2d at 852, of the second and third Loan Purchase Agreements. App. at 190-91, 195. Moreover, the "basic structure" of the alleged misrepresentation, Daddona, 9 F.3d at 317, namely the reliance on non-conforming, inflated appraisals in calculating the

24

plaintiffs' mortgages, appears plainly on the face of the agreements. Thus, although the commitment in writing of representations that fraudulently induce borrowers to execute a loan may be rare, I conclude that such is the case here and that the first criteria of § 1823(e) is satisfied.

B.

The district court dismissed plaintiffs' complaint on the ground that Carteret's Loan Purchase Agreement from GDV was not executed contemporaneously with the original mortgages between GDV and plaintiffs, thus failing the requirement of §1823(e)(2). Certainly it is undisputed that these two transactions were separated by a period of years. I believe the district court's conclusion, however, is premised on a flawed construction of § 1823(e)(2).

We have not previously considered the meaning of the "contemporaneous execution" condition, but a split may be emerging among other circuits. Some courts have strictly enforced this requirement. See, e.g., FDIC v. La Rambla Shopping Center, Inc., 791 F.2d 215, 220 (1st Cir. 1986) (lease executed two years before note unenforceable); Cardente v. Fleet Bank of Maine, Inc., 796 F. Supp. 603, 611 (D.Me. 1992) (lease executed two weeks before note unenforceable, where note lacks any reference to lease); RTC v. Crow, 763 F. Supp. 887, 892-94 (N.D. Tex. 1991) (refinancing agreement signed three years after execution of original loan unenforceable).

More recently, however, the Eighth Circuit suggested that the contemporaneous execution requirement might be best

25

understood in light of "general business practice." FDIC v. Manatt, 922 F.2d 486, 489 n.4 (8th Cir. 1991) (observing accord and satisfaction will necessarily be executed subsequent in time to original note), cert. denied, 501 U.S. 1250 (1991).[0] Adopting the Eighth Circuit's suggestion, the Ninth Circuit held that "satisfaction of the contemporaneousness requirement should be considered in light of commercial reality." RTC v. Midwest Federal Sav. Bank of Minot, 36 F.3d 785, 797-98 (9th Cir. 1994). The Ninth Circuit went on to conclude that a commitment letter executed more than two months before loan documents had satisfied the contemporaneous execution requirement. Id. See also Erbafina v. FDIC, 855 F. Supp. 9, 12 (D. Mass. 1994) (commitment letter negotiated several days before execution of loan satisfies § 1823(e)(2)).

A review of the legislative history of § 1823(e), which was enacted in 1950 and slightly amended in 1989, lends no insight into the legislative intent behind the contemporaneous execution requirement. See H.R. Rep. No 2564, 81st Cong., 2d Sess. (1950), reprinted at 1950 U.S.C.C.A.N. 3765; Conf. Rep. No. 3049, 81st Cong., 2d Sess. (1950), reprinted at 1950 U.S.C.C.A.N. 3776; H.R. Rep. No. 54(I), 101st Cong., 1st Sess. (1989),

---

[0] Prior to its decision in Manatt, the Eighth Circuit had relied on a strict interpretation of the contemporaneousness requirement to conclude that he Eighth and Ni executed five months before the making of a note was unenforceable. FDIC v. Virginia Crossings Partnership, 909 F.2d 306, 309-10 (8th Cir. 1990). However, Manatt suggests that Virginia Crossings may no longer be good law in the Eighth Circuit, although the panel there declined to overrule it explicitly since "an interpretation of [§ 1823(e)(2)] [was] not necessary to a decision in [that] case." Manatt, 922 F.2d at 489 n.4.

26

reprinted at 1989 U.S.C.C.A.N. 86; Conf. Rep. No. 222, 101st Cong., 1st Sess. (1989), reprinted at 1989 U.S.C.C.A.N. 432.

On balance I am persuaded by the reasoning of the Eighth and Ninth Circuits, and conclude that § 1823(e)(2) must be read in light of commercial reality. When there exists a secondary market for mortgage notes, the original loan and subsequent acquisition will never be precisely contemporaneous. Nonetheless, where execution of a side agreement either (1) is contemporaneous with origination of a note, and the "basic structure of the agreement," Daddona, 9 F.3d at 319, is evident from the face of the resale documents, or (2) is contemporaneous with a bank's acquisition of a note in the secondary market, then § 1823(e)(2) should be satisfied.

In addition to the respect for common sense and commercial reality which shaped the decisions of the Eighth and Ninth Circuits, my conclusion is supported by several other considerations. First, it would be contradictory and illogical to rely on the Loan Purchase Agreements as the link that made plaintiffs Carteret's obligors and thus requires that § 1823(e) applies in this case, but then disregard those same agreements in considering § 1823(e)(2).

Second, my construction of § 1823(e)(2) comports with the legislative intent identified by the Supreme Court as underlying § 1823(e), namely that bank examiners be on notice of the real worth of an asset, that "unusual transactions" be approved by senior bank officials, and that "new terms" not be added to a loan subsequent to its origination. Langley, 484 U.S.

27

at 92.  These concerns are met by enforcing the requirement that either (1) a side agreement be executed contemporaneous with a bank's acquisition of a note on the secondary market, or (2) it be executed contemporaneous with execution of original note and that its basic structure be clear from the face of the subsequent resale documents.

Finally, to hold otherwise would immunize the RTC from honoring an otherwise valid collateral agreement -- one done in writing, contemporaneous with the origination or resale of the loan, approved by a bank's directors, and maintained continuously in its records -- simply because the loan was resold on the secondary market.  Taken to its extreme, the contemporaneousness requirement could deny relief to defrauded borrowers even if the subsequent loan purchase documents specifically acknowledged the existence of a likely fraud claim or defense based upon the initial transaction, and the purchase was openly discounted as a result.

Here, the "agreement" -- GDV's inflated, non-conforming appraisals -- is referenced in writing and in detail in the very same documents by which Carteret acquired the mortgages.  These references are thus contemporaneous with Carteret's acquisition of the notes.  Bank examiners were on notice of the problems with the mortgages, senior Carteret officials had the opportunity to review these "unusual transactions," and there is no allegation that "new terms" were added after the purchase agreement.  Hence I conclude that plaintiffs have satisfied the contemporaneous execution condition of § 1823(e)(2).

C.

On this appeal the RTC does not contend that the final two criteria of § 1823(e) -- approval by Carteret's board of directors and continuous maintenance of the loan documents in Carteret's records -- are unmet, except in a brief aside that cites to nothing in the record but states "[t]he representations, warranties and conditions that Appellants seek to enforce are not in writing, and hence were not executed by Appellants or by Carteret." RTC Brief at 12.

I have already urged that the discussion of the inflated, non-conforming appraisals in the Loan Purchase Agreements are adequate to satisfy the writing requirement of §1823(e)(1). The only evidence of record before us shows that the Loan Purchase Agreements, as well as the commitment letters which are incorporated into the purchase agreements, bear signatures of various Carteret, GDC, and GDV officials. App. at 182, 187, 189, 192, 199, 209, 222. In addition, the Complaints allege that plaintiffs executed mortgages which were originated by GDV. App. at 39, 90.

Accordingly, I would not affirm the order of the district court on the ground that the third or fourth conditions of § 1823(e) are unsatisfied.

V.

It is undisputed that the plaintiffs in this matter were defrauded. Carteret accepted the loans with knowledge of that fraud, and that knowledge was readily ascertainable from a reasonable inspection of the loan documents. Neither the purpose

29

or language of the statute would be satisfied by denying plaintiffs the right to assert such fraud so readily apparent and so flagrant.

For the foregoing reasons, I would reverse the order of the district court.