

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-28-2006

# USA v. Hull

Precedential or Non-Precedential: Precedential

Docket No. 05-2028

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Hull" (2006). *2006 Decisions*. Paper 642.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/642

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-2028

———

UNITED STATES OF AMERICA

v.

DAVID WAYNE HULL,

Appellant

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Criminal No. 03-cr-00096-1)
District Judge: Honorable Gary L. Lancaster

———

Argued May 18, 2006

Before: RENDELL and VAN ANTWERPEN, Circuit Judges,
and ACKERMAN, District Judge[*]

———

[*]Honorable Harold A. Ackerman, Senior United States
District Judge for the District of New Jersey, sitting by designation.

(Filed: July 28, 2006)

Lisa B. Freeland
Karen S. Gerlach (Argued)
Federal Public Defender Office
1450 Liberty Center
1001 Liberty Avenue
Pittsburgh, PA 15222

*Counsel for Appellant*

Mary Beth Buchanan
Laura S. Irwin (Argued)
Office of the United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219

*Counsel for the Government*

____

OPINION OF THE COURT

____

VAN ANTWERPEN, Circuit Judge.

David Wayne Hull appeals from the judgment of conviction entered by the District Court after he was found guilty by a jury on 7 of 10 counts related to explosives, firearms, and witness tampering. We will vacate Hull's conviction as to Count 7, and affirm the judgment of conviction as to all remaining counts.

2

I.

David Wayne Hull, the admitted Imperial Wizard of the splinter group White Knights of the Ku Klux Klan, was arrested on February 13, 2003.  A search warrant was executed by law enforcement on his home.  Agents found loaded handguns, a rocket tube, military-style weapons, ammunition, a silencer and accompanying instructions for manufacture, diagrams and instructions for making pipe bombs and booby-traps, explosives components, and, outside the home, cars damaged by explosions but still containing parts of pipe bombs.  Hull did not have licenses or registrations for any of the weapons or explosives, or the silencer.

The FBI had had Hull under surveillance and investigation for several years, utilizing a government informant to infiltrate and observe the KKK.  This informant met Hull and other members of the KKK at various gatherings and privately at Hull's house.  The informant watched and participated in the detonation of several pipe bombs and other explosives, and the testing of silencers.  The informant also discussed the making of pipe bombs with Hull, and repeatedly requested that Hull construct pipe bombs for him.  At some point, Hull apparently deduced the informant was just that, and allegedly took steps to provide him with only bomb components (minus the fuse) instead of a completed pipe bomb.  The informant also cooperated with the FBI to record conversations with Hull, beginning in September 2002.

A District Judge from the Eastern District of Pennsylvania approved a wiretap interception order on January

13, 2003, for various suspects' phones, including Hull's home and cell phones. In the supporting wiretap affidavit, agents promised to "minimize" the interceptions by screening out: calls under two minutes; calls not involving Hull or any other named interceptee; and conversations "non-criminal in nature." The agents reserved the right to "spot-check" any of these calls to "ensure that the conversations have not turned to criminal matters." In practice, this procedure involved initial monitoring for identity and subject verification; one minute without monitoring if the call fell into an above category; then two minutes of active monitoring for "spot-checking"; and so forth until the call was completed. Several of the resulting intercepts were later used in Hull's trial.

Hull was eventually indicted by a federal grand jury, which indictment was followed by a ten-count superseding indictment. The superseding indictment charged Hull with: Counts 1, 2, 3, and 4, possession of unregistered firearms (pipe bombs and a silencer) on various dates; Count 5, transfer of a firearm (pipe bomb); Count 6, manufacture of a firearm (pipe bomb); Counts 7 and 8, teaching or demonstrating, and distributing information regarding, the making and use of a pipe bomb with the intent that the teaching or information be used for a "Federal crime of violence" ("unlawful possession of a pipe bomb") on two dates; Count 9, possession of a firearm in interstate commerce by a felon; and Count 10, attempting to influence the testimony of a witness.

Hull pleaded not guilty and moved to have the wiretap interceptions suppressed. The District Court denied the motion on May 7, 2004, and the case was tried to a jury in the Western

4

District of Pennsylvania. Over the course of several weeks, the jury heard testimony from various FBI and law enforcement agents, technical experts, and several informants and cooperating witnesses. One of Hull's girlfriends, Deborah Rusch, testified that she had helped Hull by using her legal secretary position and skills to format articles for publication in a KKK newspaper. The articles dealt with topics including the manufacture of propane tank explosives and pipe bombs; several were attributed to an author identified as the "Unknown Terrorist." Rusch had also had conversations with Hull about explosives. Rusch later received several letters from Hull while he was in prison, and turned these letters over to the FBI. The letters asked her to "remember" several conversations; to say that they were merely "casually dat[ing]" instead of calling herself his girlfriend; reminded her of things she "knew"; listed things she "must tell . . . to the jury"; and, most critically, to tell the jury that she did not believe Hull wrote the "Unknown Terrorist" articles. She was then instructed to burn one of the letters. On the stand, Rusch testified instead that she did not recall ever speaking with a specific FBI agent, as alleged in the letters, and that she *did* believe Hull to be the Unknown Terrorist, as most, but not all, of the articles matched his writing style.

Hull took the stand in his own defense, and testified that neither he nor the White Knights had ever espoused violence, or had intended to hurt anyone. He denied being the "Unknown Terrorist," or that he had ever demonstrated how to make a pipe bomb to anyone or participated in detonating any pipe bombs. All the firearms and explosives components, he alleged, were for legitimate purposes. He claimed that he knew all along that

5

the informant was helping law enforcement, and therefore purposefully refused to give him an assembled bomb.

At the close of the trial, the District Court instructed the jury. In particular, the District Court refused to include a proposed instruction from Hull that in order to be found guilty of "transferr[ing]" a firearm, he had to know and intend that the bomb, unassembled and without a fuse, constitute a firearm. The District Court did instruct the jury that mere *possession* of a bomb could qualify as a "Federal crime of violence," after expressing deep doubts over the issue and noting that the court had not "made up my mind on this."

On May 28, 2004, the jury returned verdicts of not guilty on 3 of the 10 counts (possession of a pipe bomb on 2 of 3 relevant dates, and distribution of information related to a pipe bomb on one date). The jury found Hull guilty of the remaining 7 counts. On March 21, 2005, the District Court sentenced Hull to 144 months imprisonment for the distribution of information related to a pipe bomb (Count 7), to run concurrently with sentences of 120 months imprisonment for each of the remaining six counts of conviction. Hull now appeals his conviction on myriad grounds.[1]

## II.

Hull raises five challenges to his conviction, one of which we find meritorious and thus will address first in detail.

---

[1]The District Court had jurisdiction pursuant to 18 U.S.C. § 3231; we have jurisdiction pursuant to 18 U.S.C. § 1291.

Hull alleges that: (1) mere "possession" of a pipe bomb, as charged in the indictment, does not qualify as a "Federal crime of violence" under 18 U.S.C. § 842(p)(2)(A); (2) the evidence was insufficient to prove the witness tampering change; (3) the wiretaps should have been suppressed due to the Government's failure to properly "minimize" interceptions; (4) for the purpose of making, possessing, or transferring a firearm, Hull could not be convicted because he did not intend that a pipe bomb, unassembled, be assembled into a firearm; and (5) 18 U.S.C. § 922(g)(1), felon in possession of a firearm, is unconstitutional. We have rejected this last contention outright, and will not give it further consideration here. United States v. Singletary, 268 F.3d 196 (3d Cir. 2001).

### III.

Hull's first argument presents a matter of first impression in this Court, and to our knowledge, in any court of appeals. Hull was convicted, at Count 7, of violating 18 U.S.C. § 842(p)(2)(A):

> "(p) Distribution of information relating to explosives, destructive devices, and weapons of mass destruction.
>
> (1) Definitions. In this subsection--
>> (A) the term 'destructive device' has the same meaning as in section 921(a)(4);
>> (B) the term 'explosive' has the same meaning as in section 844(j); and
>> (C) the term 'weapon of mass destruction' has the same meaning as in section 2332a(c)(2).

(2) Prohibition. It shall be unlawful for any person--
   (A) to teach or demonstrate the making or use of an explosive, a destructive device, or a weapon of mass destruction, or to distribute by any means information pertaining to, in whole or in part, the manufacture or use of an explosive, destructive device, or weapon of mass destruction, *with the intent that the teaching, demonstration, or information be used for, or in furtherance of, an activity that constitutes a Federal crime of violence*;" (emphasis added)

The superseding indictment charged that the "Federal crime of violence" at issue was *solely* the "unlawful possession of a pipe bomb," on or about November 19, 2002.[2] As we will set out below, "crime of violence" is not defined in the statute.

The District Court instructed the jury that:

"[P]ossession of an unregistered pipe bomb is a federal crime of violence. . . . The government does not have to prove defendant intended the recipient of the information to blow up someplace or blow up somebody. They need only prove that the defendant intended the recipient of this information to make and thereafter possess the pipe bomb."

---

[2]Count 8 charged Hull with the identical crime, but committed in or around May 2002. Hull was found not guilty of Count 8, however, and therefore does not challenge the construction of 18 U.S.C. § 842(p)(2)(A) as to Count 8.

Hull alleges that simple *possession* of a pipe bomb, as opposed to the *use* or detonation of a pipe bomb, cannot qualify as a "Federal crime of violence" under § 842(p)(2)(A), and that his conviction at Count 7 must be vacated. We exercise plenary review over questions of law, such as whether a crime is a crime of violence, United States v. Luster, 305 F.3d 199, 200 (3d Cir. 2002). We will vacate the conviction for Count 7.

We note first the regrettable fact that we do not have the benefit of any analysis or ruling by the District Court on this issue. The District Court initially expressed its "concern" to the parties during trial that "if the mere possession satisfied the crime of violence element, why even put that element into it? Transferring it implies the other person is going to possess it. . . . [that is,] [t]he teaching charge, not the transfer, the teaching charge." App. vol. IV.1109. Both Hull and the Government submitted memoranda on the point, and while later in the trial, the District Court returned to the issue again, expressing doubt on the Government's theory of the charge, it did not analyze the issue on the record:

> "I read your briefs about this, whether or not mere possession alone constitutes a crime of violence. I think it is a very close question. I haven't made up my mind on this. Probably what I will do, though, is I might submit it to the jury as proferred by the government, and then in post-verdict motions, if they find the guy not guilty, then it's moot. If they find him guilty, then as a matter of law, I can rule whether or not to take out the verdict. And then if it goes to the Court of Appeals, at least we'll have a verdict. If I'm wrong, we'll have to do

it again."  App. vol. IV.1348.

The District Court then gave the requested jury instruction we have set forth above, without further discussion.

With regard to 18 U.S.C. § 842(p)(2)(A), we are treading on fairly undisturbed ground.  Section 842(p) was added to the criminal code in 1999, see P.L. 106-54 § 2(a), 113 Stat. 398 (Aug. 17, 1999), and as yet has been applied only sparingly across the country.

Unfortunately, as we noted above § 842(p) does not define "Federal crime of violence."  Accordingly, the Supreme Court recently instructed courts to look at 18 U.S.C. § 16's definition of "crime of violence" for the purposes of 18 U.S.C. § 842(p).  Leocal v. Ashcroft, 543 U.S. 1, 7 n.4 (2004) ("a number of statutes criminalize conduct that has as an element the commission of a crime of violence under § 16.  See, e.g., 18 U.S.C. § 842(p)").  Leocal, which examined in detail § 16's usage of the term, therefore controls our analysis under § 842.  18 U.S.C. § 16 defines "crime of violence" as follows:

> "(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (b) any other offense that is a felony and that, by its nature, *involves a substantial risk that physical force* against the person or property of another may be *used in the course of committing the offense*." (emphases added)

10

The Supreme Court in <u>Leocal</u> considered whether a conviction for a state DUI offense that did not require proof of a mental state nonetheless qualified as a crime of violence under § 16. The Court concluded that it did not fit either § 16(a) or (b). Under § 16(a), the Court held that "use" requires the "active employment" of force, and therefore a degree of intent higher than negligence. <u>Leocal</u>, 543 U.S. at 9. Nor did the DUI conviction qualify under § 16(b), which "covers offenses that naturally involve a person acting in disregard of the risk that physical force might be used against another *in committing the offense*." <u>Leocal</u>, 543 U.S. at 10 (emphasis added). "Thus, § 16(b) plainly does not encompass all offenses which create a 'substantial risk' that injury will result from a person's conduct. The 'substantial risk' in § 16(b) relates to the use of force, not to the possible effect of a person's conduct." <u>Id.</u> at 10 n.7.

Here the Government does not allege that possession of a pipe bomb involves the *actual* use of physical force, only that it involves a substantial risk of use of physical force against another. In light of this and <u>Leocal</u>'s holding, we therefore confine our analysis to 18 U.S.C. § 16(b).

<u>Leocal</u> dictates a "categorical" approach to determining whether a crime is a crime of violence. <u>Leocal</u>, 543 U.S. at 8; <u>see</u> <u>also</u> <u>Oyebanji v. Gonzales</u>, 418 F.3d 260, 262 (3d Cir. 2005). "This . . . requires us to look to the elements and nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime." <u>Leocal</u>, 543 U.S. at 8. Our task, then, is to determine whether simply "possessing" a pipe bomb is an "offense[] that naturally involve[s] a person acting in disregard of the risk that physical force might be used against

11

another in committing the offense." Leocal, 543 U.S. at 10. We hold that it is not.

The Government's argument in favor of the District Court's charge is this: Because there are no "legitimate" uses for a pipe bomb, and because they are such dangerous items, mere possession of a pipe bomb involves the "substantial risk of physical force." Were that the complete test, we might agree. However, the Government ignores the remainder of § 16(b): "may be used *in the course of committing the offense*," (emphasis added). The Government's argument fails to acknowledge that the Supreme Court in Leocal repeatedly emphasized the importance of the requirement that the force be used in *committing* the offense, and here the offense is but one of possession. "The risk that an accident may occur when an individual drives while intoxicated is simply not the same thing as the risk that the individual may 'use' physical force against another in committing the DUI offense." Leocal, 543 U.S. at 10 n.7. This element of § 16(b) is perhaps the most important. The Leocal Court rejected, as dissimilar and insufficient, the definition and interpretation of U.S.S.G. § 4B1.2(a)(2)'s definition of "crime of violence," which required only "conduct which presents a serious potential risk of physical injury to another." Leocal, 543 U.S. at 10 n.7. This latter definition, by contrast, might have covered the possession of a pipe bomb.

The danger from a pipe bomb comes not from the offense of possession, but from the added factor of *use* of the pipe bomb. See Leocal, 543 U.S. at 9 ("'use' requires active employment") (citing Bailey v. United States, 516 U.S. 137, 143 (1995) (substantive holding superseded by statute)); Bailey, 516

12

U.S. at 144 ("use . . . requires more than a showing of mere possession"). To commit the offense of possession, Hull merely had to exercise control or dominion over the pipe bomb. There is no risk that physical force might be used against another to commit the offense of *possession*, regardless of whether pipe bombs have a legitimate purpose or not. Cf. United States v. Bowers, 432 F.3d 518, 519 (3d Cir. 2005) ("[A] felon in possession has committed a crime of violence only if the nature of that offense is such that there is a 'substantial risk' that he will use 'physical force' against another 'in the course of' his *possession* of the weapon.") (emphasis added). In contrast, had Hull been charged in the indictment with *using* a pipe bomb, then commission of such an offense would "involve[] a substantial risk that physical force against the person or property of another may be used in the course of committing" *that* offense. 18 U.S.C. § 16(b). *Use* of a pipe bomb is the type of "violent, *active* crime[]" the Supreme Court found constituted a crime of violence under § 16. Leocal, 543 U.S. at 11 (emphasis added). Possession is simply not such an "active" crime; "A crime that increases the likelihood of a crime of violence need not itself be a crime of violence." United States v. Lane, 252 F.3d 905, 907 (7th Cir. 2001), quoted with approval in Bowers, 432 F.3d at 522.

The Government's theory that a pipe bomb might "go off" at any moment and is therefore inherently, and unredeemably, dangerous, is further foreclosed by our recent decision in Tran v. Gonzales, 414 F.3d 464 (3d Cir. 2005). Tran addressed whether "reckless burning or exploding" constituted a crime of violence under § 16, and concluded that it did not. We held that "§ 16(b) crimes are those raising a substantial risk

13

that the actor will *intentionally* use force in the furtherance of the offense." Id., 414 F.3d at 471 (emphasis in original). We reasoned that:

> "This element [recklessly endangering the property of another], on its face, involves a substantial risk of causing injury to the property of another. But it does not involve a substantial risk of *using force* against the property of another. The substantial risk involved in the Pennsylvania statute is the risk that the fire started by the offender will spread and damage the property of another. This risk cannot be said to involve the intentional use of force, as required by [United States v.] Parson [, 955 F.2d 858 (3d Cir. 1992)]. The statute does not contemplate a risk that the reckless-burning offender will step in and commit an *intentional* act of violence . . . ."

Id. at 472-73 (emphasis in original). Similarly here, mere possession of a pipe bomb holds no risk of the *intentional* use of force. Even if, as the Government posited at argument, a pipe bomb can unexpectedly explode (and the possessor has this knowledge) during even the most passive constructive possessions, such an explosion would not have been the result of any *intentional* use of force. Possessing a pipe bomb does not necessarily include a substantial risk that the possessor might step in and intentionally detonate the device, i.e., use force within the meaning of § 16.

The Government points us to several other statutes under which courts have found the mere possession of a "firearm" to constitute a crime of violence. We do not find these statutes or

14

case law persuasive with respect to the case at hand. The Government relies most heavily on a Fifth Circuit case, United States v. Jennings, 195 F.3d 795 (5th Cir. 1999), interpreting 18 U.S.C. § 924(c), which defines "crime of violence" in the same language as § 16. The Jennings court held that possession of a pipe bomb satisfied that definition in the context of the possession of a firearm in relation to a crime of violence. First, Jennings is in no way binding on this Court. Second, we disagree with the analysis of the Jennings court because it conflates "use" with "possession," which conflation the Supreme Court took the opportunity to explicitly forbid in its later opinion in Leocal. See, e.g., Jennings, 195 F.3d at 798 ("We hold that *possession* of an unregistered pipe bomb, by its very nature, creates a substantial risk of violence. . . . In fact, we cannot conceive of any non-violent or lawful *uses* for a pipe bomb.") (emphases added).

As discussed, the relevant inquiry is not whether possession makes it more likely that a violent crime will be committed, but instead whether there is a risk that in committing the offense of *possession*, force will be used. See Lane, 252 F.3d at 907.

The remainder of the Government's analogies are similarly inapposite.[3] The Government suggests that we look to

---

[3] At oral argument the Government abandoned its analogy to the Bail Reform Act, 18 U.S.C. § 3142. In Bowers, we joined four other Circuits in rejecting the Government's argument that for bail purposes, a "felon-in-possession offense constitutes a 'crime of violence,'" Br. for the United States at 63. See Bowers, 432 F.3d

15

cases interpreting U.S.S.G. § 4B1.2 for guidance. Here we are troubled by the Government's lack of candor. Unlike any of the previous definitions of "crime of violence" quoted by the Government, § 4B1.2(a) (which the Government explicitly does not quote or reference) defines a crime of violence as one that:

> "(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or
> (2) is burglary of a dwelling, arson, or extortion, *involves use of explosives, or otherwise* involves conduct that presents a serious potential risk of physical injury to another." (emphasis added)

Guidelines § 4B1.2 is inapposite to this case for at least two reasons. First, Leocal *explicitly* rejected using § 4B1.2 to interpret § 16 (and by extension, § 842(p)). Leocal, 543 U.S. at 10 n.7. Second, § 4B1.2 specifically sets apart "use of explosives" from any other "conduct that presents a serious potential risk of physical injury to another." This implies that "possession" of an explosive *cannot qualify* as a crime of violence under § 4B1.2; if it did, we would be required to read "use of explosives" out of the Guideline provision. See United States v. Fish, 368 F.3d 1200, 1204 (9th Cir. 2004) ("Interpreting the catchall phrase . . . to cover *possession* of a 'pipe bomb' would render the provision's specific inclusion of 'use of explosives' in the same section surplusage."); see also id. at 1205 ("To 'use' an explosive, one must first necessarily 'possess' it."). For this reason, none of the numerous cases cited

at 521 (reaffirming Royce v. Hahn, 151 F.3d 116 (3d Cir. 1998)).

16

by the Government finding mere possession of a *firearm*, but not an explosive device, to be a crime of violence under § 4B1.2, is applicable.

Ultimately we, like the District Court and the jury, are limited by the charge in the superseding indictment. Had the indictment charged that the federal crime of violence intended was the *use* or *detonation* of a pipe bomb, we would have no difficulty upholding the validity of the jury instruction. Instead, however, the indictment charged Hull with only the intent that his teaching lead to the mere possession of a pipe bomb. The District Court erred in holding that such possession on its own legally constituted a federal crime of violence under 18 U.S.C. § 842(p), or by extension 18 U.S.C. § 16. Accordingly, the judgment of conviction on Count 7 will be vacated.

IV.

Hull next challenges the sufficiency of the evidence on Count 10, witness tampering. Our review is plenary, but deferential inasmuch as "we must . . . consider the evidence in the light most favorable to the verdict and ask whether a reasonable jury could have found that the contested elements were proven beyond a reasonable doubt." United States v. Cohen, 301 F.3d 152, 156-57 (3d Cir. 2002). This is a heavy burden for Hull to meet, United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998), and he has not done so on appeal.

Hull was convicted under 18 U.S.C. § 1512(b)(1), which penalizes "Whoever knowingly uses intimidation, threatens or corruptly persuades another person, or attempts to do so, or

17

engages in misleading conduct toward another person, with intent to– (1) influence, delay or prevent the testimony of any person in an official proceeding." Specifically, the Government accused Hull of attempting to corruptly persuade Debbie Rusch to testify that she did not believe he was the Unknown Terrorist, when in fact, as she later testified, she *did* believe he was the Unknown Terrorist; and that he knew the falsehood of his desired testimony.[4]

As to Hull's knowledge, there was ample evidence from which the jury could conclude that Hull knowingly attempted to corruptly persuade Rusch, with the intent to change her testimony. See United States v. Farrell, 126 F.3d 484, 488 (3d Cir. 1997) (holding that "corrupt persuasion" includes "attempting to persuade someone to provide false information to federal investigators"). "[T]he defendant must know that his conduct has the natural and probable effect of interfering with the witness's communication, whether or not it succeeds." United States v. Davis, 183 F.3d 231, 248 (3d Cir. 1999). In his letter telling Rusch to testify on the stand that "I sent [the Unknown Terrorist article] to ya but you don't think I wrote it," Hull told Rusch to immediately burn the letter. Thus, the letter went beyond simply encouraging Rusch not to aid federal investigators, which encouragement alone we excepted from § 1512(b)'s purview under the circumstances of Farrell. We note

---

[4]While the superseding indictment included allegations that Hull attempted to corruptly persuade Rusch on various topics, including that someone else drilled an end cap and that Hull refused to deal with the confidential informant, the District Court charged the jury based only on the Unknown Terrorist allegation.

18

that, contrary to Hull's assertions on appeal, whether or not the jury had difficulty with certain elements of the charge is ultimately not "proof" that the conviction does not rest on substantial evidence, nor does Hull's explanation that Rusch had a poor memory in need of refreshing somehow justify his suggestion that she testify in a way she affirmatively knew to be untrue. The jury's verdict in Count 10 was supported by substantial evidence.

V.

Hull next renews his attempt to suppress the wiretap interceptions on the ground that agents failed to "minimize" the interceptions and monitoring. Our review of the District Court's factual findings in a suppression hearing is for clear error. United States v. Naranjo, 426 F.3d 221, 226 (3d Cir. 2005). Our review of legal rulings and mixed questions of law and fact is plenary. Id. 18 U.S.C. § 2518(5) requires as follows:

> "Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days."

The interception application and order in this case did include a plan to minimize interceptions, as Hull acknowledges. Nonetheless, because some of the intercepted conversations

19

were between Hull and his various girlfriends or Hull and commercial businesses, and because the subject matter included sexual discussions, Hull alleges a failure to minimize in practice. We note, however, that none of the calls Hull labels as "non-pertinent" were played for the jury.

Our inquiry is on the "reasonableness" of minimization efforts, under the totality of the circumstances. United States v. Scott, 436 U.S. 128, 140 (1978); see also United States v. Armocida, 515 F.2d 49 (3d Cir. 1975). We agree with the District Court that when investigating a wide-ranging conspiracy between parties known for their penchant for secrecy, broader interceptions may be warranted. See United States v. Adams, 759 F.2d 1099, 1115 (3d Cir. 1985); Scott, 436 U.S. at 140 (upholding uninterrupted interceptions in drug conspiracy case). The mere *number* of intercepted, but non-pertinent, calls is not dispositive. Adams, 759 F.2d at 1115; see also id. ("Appellant also can demonstrate no pattern to the interception of non-pertinent calls. Because of the variety of voices and transactions involved, the government's efforts at minimizing non-pertinent conversations was acceptable."). "The statute does not forbid the interception of all nonrelevant conversations." Scott, 436 U.S. at 140. Given, for example, the nature of the case and circumstances known to the agents during the interceptions, we discern no error in the District Court's refusal to suppress the wiretap interceptions on the ground of failure to minimize.

VI.

Finally, Hull challenges the jury instructions on Counts 4, 5, and 6, which referred to an unassembled bomb Hull

20

allegedly knowingly made, possessed, and transferred to the confidential informant. "Although we generally review jury instructions for abuse of discretion, our review is plenary when the question is whether a district court's instructions misstated the law." United States v. Dobson, 419 F.3d 231, 236 (3d Cir. 2005) (citations and quotation marks omitted). Hull disputed the jury instructions ultimately given by the District Court,[5] but did not file his own proposed instructions.

Hull was convicted under 26 U.S.C. §§ 5861(d)-(f), which state as follows:

"It shall be unlawful for any person–

[Count 4] (d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record; or

[Count 5] (e) to transfer a firearm in violation of the provisions of this chapter; or

[Count 6] (f) to make a firearm in violation of the

_____

[5]The Government contends that Hull objected only to the jury instruction at Count 5, and therefore that his challenge to Counts 4 and 6 should be reviewed only for plain error. Counts 4, 5, and 6 all relied on the same statute, however, and the District Court concluded under that statute that the Government was not required to prove Hull's intent.

provisions of this chapter;"[6]

Specifically, Hull alleges that the jury should have been told that he could only be convicted if (1) he knew that an unassembled bomb was a "firearm" under the applicable statutes; and (2) he intended that the recipient, whom he knew to be an informant, assemble or use the bomb. The District Court's refusal to instruct the jury on these elements, Hull alleges, amounted to an unconstitutional denial of his ability to mount a defense.

The Government was required to prove that Hull *knew* of the features that made what he was making, possessing, or transferring, a "firearm," Staples v. United States, 511 U.S. 600, 619 (1994), and indeed the District Court instructed the jury accordingly. However, Hull claims that the Government also had to prove that he *intended* for the unassembled parts of the pipe bomb to be assembled into a fully functioning pipe bomb. This is simply not an element of 26 U.S.C. § 5861. "Section 5861(d) makes no reference to the intent of the person in possession of an unregistered firearm." United States v. Urban, 140 F.3d 229, 232 (3d Cir. 1991).

As Hull concedes, "an unassembled bomb can also qualify . . . as a destructive device," Br. for Appellant at 60, and therefore as a "firearm," for the purposes of 26 U.S.C. §§ 5861.

---

[6]A pipe bomb is a "firearm" as defined for the purposes of 26 U.S.C. §§ 5861. Specifically, 26 U.S.C. § 5845(a)(8) defines a "firearm" as, *inter alia*, a "destructive device." 26 U.S.C. § 5845(f)(1) further defines a "destructive device" as "any explosive, incendiary, or poison gas (A) bomb."

22

See 26 U.S.C. § 5845(f)(3) (defining as a "firearm," "any combination of parts either designed or intended for use in converting any device into a destructive device as defined [above, including a bomb] and from which a destructive device may be readily assembled"). Hull ignores our previous holding that where there is no "ambiguity . . . as to the nature of the assembled device," intent is irrelevant. Urban, 140 F.3d at 233. Accordingly, we discern no error in the District Court's refusal to instruct the jury that the Government must prove Hull intended that the parts be converted into a destructive device.

## VII.

We conclude that Hull's conviction at Count 7 must be vacated, as mere possession of a pipe bomb does not qualify as a "Federal crime of violence" under 18 U.S.C. § 842(p). We will affirm the judgment of conviction on all other Counts.

ACKERMAN, Senior District Judge, CONCURRING in part and DISSENTING in part.

Today, the Court holds that there is no substantial risk

23

that a person who unlawfully possesses a pipe bomb may intentionally use physical force against another in the course of committing the offense.  Because I believe that a pipe bomb has no lawful use, and that any unlawful possession of a pipe bomb poses a substantial risk that the possessor may intentionally use physical force against another in the course of possessing the pipe bomb, I respectfully dissent from Part III of the majority's opinion.

**I.**

I begin with the plain language of the statute.  Section 16(b) of Title 18 of the United States Code defines a crime of violence to include "any . . . offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  As the Supreme Court explained in *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004), the term "use" requires more than negligent or merely accidental conduct.  Indeed, as the Third Circuit held in *Tran v. Gonzales*, 414 F.3d 464, 470 (3d Cir. 2005), it requires "specific intent to employ force, and not mere recklessness as to causing harm."

The terms "substantial risk" and "may" make clear that the actual use of physical force is not a required element of a crime of violence.  *See United States v. Dodge*, 846 F. Supp. 181, 183 (D. Conn. 1994) ("Actual use of physical force against another is not an essential element of a 'crime of violence' . . . as evidenced by the use of the conditional term 'may.'").  A "substantial risk" exists when there is a "strong

24

possibility" of the use of force. *United States v. Jennings*, 195 F.3d 795, 798 (5th Cir. 1999); *see also United States v. Dillard*, 214 F.3d 88, 95 (2d Cir. 2000) ("It is sufficient that the risk be material, important, or significant."). As other courts have recognized, the degree of probability required for a risk to be "substantial" is undefined and difficult to quantify with precision, *see, e.g.*, *Dillard*, 214 F.3d at 94, but where Congress has not supplied meaning to the words of a statute, common sense and ordinary usage are typically a court's best resort, *see Dimuzio v. Resolution Trust Corp.*, 68 F.3d 777, 783 n.5 (3d Cir. 1995); *see also Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982) ("[W]e assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.'" (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962))).

The phrase "in the course of committing the offense" is the final element of § 16(b) requiring interpretation. Congress's use of the present participle "committing" connotes present, continuing action. *See Am. Gas & Elec. Co. v. Sec. & Exch. Comm'n*, 134 F.2d 633, 648 (D.C. Cir. 1943) (Stephens, J., dissenting); *Fawn Mining Corp. v. Hudson*, 878 F. Supp. 240, 243 (D.D.C. 1995). This usage accords with the prepositional phrase "in the course," which suggests not merely a passing instant, but a continuum of time during which a state or condition exists. *See Webster's Third New International Dictionary* 522 (1993) (defining "course" to mean "progress or progression through a series . . . or through a development or a period," or "an ordered continuing process, succession, sequence, or series"); *see also Dillard*, 214 F.3d at 93 (equating "in the course" with "during").

25

Finally, the statute speaks plainly of "the offense," meaning the whole offense, and not merely a portion or an aspect of a given offense. Thus, common sense and ordinary rules of usage dictate that "in the course of committing the offense" should encompass nothing less than *all* conduct comprising a given offense. This, in turn, requires a court to consider the entire period during which it can be said the offense is being committed.

Against this interpretive backdrop, I read "crime of violence" under § 16(b) to mean any offense that is a felony and that, by its nature, involves a strong possibility that intentional physical force against the person or property of another may be used in the period of time during which the offense is being committed. This reading flows from the plain language of the statute and honors the common meaning of its terms. Moreover, because I find no ambiguity in the terms of § 16(b), I find no occasion to resort to the rule of lenity. *Cf. Leocal*, 543 U.S. at 11 n.8.

The Court today affirms Hull's felony conviction for possession of an unregistered pipe bomb. However, the majority opines that "[t]here is no risk that physical force might be used against another to commit the offense of possession, regardless of whether pipe bombs have a legitimate purpose or not." Maj. Op. at 13 (emphasis omitted). This interpretation distorts the language of § 16(b) and significantly narrows its scope. By substituting "to commit the offense" in place of "in the course of committing the offense," the majority adopts an interpretation under which, once possession is initially obtained, a court need not

26

concern itself with whether there is any substantial risk that the pipe bomb may be used thereafter.  The majority considers only the risk incident to effectuating the offense, and not the risk that may exist during the continuing offense.  For instance, the majority opines that "[t]o commit the offense of possession, Hull merely had to exercise control or dominion over the pipe bomb." *Id.*  This interpretation ignores the ongoing substantial risk that may exist *throughout the course of possession*.  I believe that the literal language of the statute calls for a broader reading that takes into account any substantial risk that may arise in the course of the continuing offense.  Under such a broad reading, if a substantial risk that physical force may be used against another arises at any time in the course of possessing a pipe bomb, the crime constitutes a crime of violence.

The broad reading of § 16(b) that I propose enjoys a logical consistency lacking in the majority's interpretation.  It defies contradiction that a person who obtains possession of a pipe bomb on Monday is still "committing the offense" of possession on Friday if he or she exercised continuous dominion or control.  Thus, the "course of committing the offense" of possession includes the initial exercise of dominion or control, the moment dominion or control is relinquished, and all times in between.  At any given time within this continuum, it is obvious that the person is "committing the offense" of possession.

Nothing in *Leocal* dissuades me from this conclusion.  In *Leocal*, the late Chief Justice posed the example of burglary as a crime for which there was a substantial risk that

27

force would be used against the person or property of another. 543 U.S. at 10. At common law, an element of burglary was breaking, which, by definition, required the use of force. William Blackstone, 4 *Commentaries* \*225. Although courts differ as to whether burglary is a continuing offense,[7] the "substantial risk" element of § 16(b) is, at all events, satisfied upon the initial act of breaking. Therefore, a court need look no further than the initial breaking to conclude that burglary is a federal crime of violence. This is why Congress and the Court in *Leocal* identified burglary as the "classic example" of a crime of violence under § 16(b). 543 U.S. at 10; *see also* S. Rep. No. 98-225, at 307 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3487.

Possession, on the other hand, is almost universally recognized to be a continuing offense. *See, e.g.*, *United States v. Zidell*, 323 F.3d 412, 422 (6th Cir. 2003) (noting that "possession with intent to distribute a controlled substance is a continuing offense," and collecting cases); *United States v. Fleischli*, 305 F.3d 643, 658 (7th Cir. 2002) ("Possession of a firearm is a continuing offense which ceases only when the possession stops."); *United States v. Blizzard*, 27 F.3d 100, 102 (4th Cir. 1994) ("[P]ossession is by nature a continuing offense."); William Meyerhofer, *Statutory Restrictions on*

---

[7] *Compare People v. Shipley*, 662 N.W.2d 856, 863 (Mich. Ct. App. 2003) (holding that burglary is not a continuing offense), *and State v. Brown*, 626 So. 2d 851, 854 (La. Ct. App. 1993) (same), *with State v. Stearns*, 645 So. 2d 417, 418 (Fla. 1999) (holding that armed burglary is a continuing offense).

28

*Weapons Possession: Must the Right to Self-Defense Fall Victim?*, 1996 N.Y.U. Ann. Surv. Am. L. 219, 233 ("Because possession is a continuing offense, there is ordinarily no single act which can be used to establish the defendant's guilt. There is, rather, a continuum of time during which the defendant possessed the weapon." (footnotes omitted)). Indeed, "Congress intended the crime of possession to refer to a course of conduct rather than individual acts of dominion." *United States v. Jones*, 403 F.3d 604, 606 (8th Cir. 2005) (holding that "the continuous possession of the same firearm constitutes a single offense"). "Possession is a course of conduct, not an act; by prohibiting possession Congress intended to punish as one offense all of the acts of dominion which demonstrate a continuing possessory interest in a firearm." *United States v. Jones*, 533 F.2d 1387, 1391 (6th Cir. 1976). To effectuate possession, it is true, one need not use force. However, simply because force was not used initially in obtaining possession does not excuse a court from its obligation to consider the full "course" of the continuing offense. *See United States v. Medina-Anicacio*, 325 F.3d 638, 650 (5th Cir. 2003) (Garza, J., dissenting) ("The unlawful possession of a dangerous weapon is an ongoing course of conduct. Thus, an individual continues to commit the offense as long as he holds onto the weapon." (citations omitted)).

Pre-*Leocal* decisions from our sister circuits reflect a clear understanding and acceptance of the judicial responsibility to consider the full course of the continuing offense of possession. Numerous courts of appeals have recognized that certain crimes of possession may qualify as crimes of violence. *See, e.g.*, *United States v. Rivas-Palacios*,

244 F.3d 396, 397-98 (5th Cir. 2001) (sawed-off shotgun); *Sutherland v. Flemming*, 229 F.3d 1164 (Table), 2000 WL 1174566, at *1 (10th Cir. 2000) ("Possession of a machine gun, by its very nature, involves a substantial risk of violence or force . . . ."); *Dillard*, 214 F.3d at 97 & n.9 (possession of firearm by convicted felon); *Jennings*, 195 F.3d at 797-99 (pipe bomb); *United States v. Drapeau*, 188 F.3d 987, 990 (8th Cir. 1999) (bomb); *United States v. Newman*, 125 F.3d 863 (Table), 1997 WL 603740, at *1 (10th Cir. 1997) (pipe bomb); *Impounded*, 117 F.3d 730, 738 & n.12 (3d Cir. 1997) (holding that possession with intent to use dangerous or deadly weapon is a "crime of violence"); *United States v. Amparo*, 68 F.3d 1222, 1226 (9th Cir. 1995) (referring to "uniform holdings" that "mere possession of an unregistered firearm is a crime of violence"); *United States v. Dunn*, 946 F.2d 615, 620-21 (9th Cir. 1991) (sawed-off shotgun); *see also United States v. Fortes*, 141 F.3d 1, 7-8 (1st Cir. 1998) (holding that possession of sawed-off shotgun is a "violent felony"); *United States v. Jay*, Nos. 03-M-3114-01, 03-M-3114-02, 2004 WL 744410, at *1-2 (M.D. Fla. Apr. 8, 2004) (pipe bomb); *United States v. Powers*, 318 F. Supp. 2d 339, 342 (W.D. Va. 2004) (collecting cases); *United States v. Butler*, 165 F.R.D. 68, 71-72 (N.D. Ohio 1996) (felon in possession of rifle and pipe bomb); *Dodge*, 846 F. Supp. at 183-84 (silencer and pipe bomb). Under the majority's reading of § 16(b), these cases are no longer good law. Because I do not believe that *Leocal* prohibited courts from considering the entire course of a continuing offense when determining whether that offense constitutes a crime of violence, I do not believe that *Leocal* rendered these cases, and their logic, obsolete.

30

## II.

If this Court were to consider the full course of the continuing offense of possession of a pipe bomb, I believe it would be compelled to conclude, as so many other courts have done already, that when a person unlawfully possesses a pipe bomb, there is a substantial risk that that person may intentionally use force against another. Unlike many other types of "firearms," a pipe bomb has no legitimate social purpose. As the Fifth Circuit has recognized,

> [u]nlike a handgun, it is not considered sport to hunt or engage in target practice with a pipe bomb. Moreover, it would be quite difficult to protect oneself or one's family with a pipe bomb. In fact, we cannot conceive of any non-violent or lawful uses for a pipe bomb.

*Jennings*, 195 F.3d at 798 (footnotes omitted). The Ninth Circuit has added that pipe bombs "have no legitimate purpose and . . . have the potential to kill indiscriminately, without warning, and with less chance that the perpetrator will be caught." *United States v. Loveday*, 922 F.2d 1411, 1416 (9th Cir. 1991); *see also United States v. Dempsey*, 957 F.2d 831, 834 (11th Cir. 1992) (quoting *Loveday*). A panel of the Tenth Circuit similarly concluded that "[p]ipe bombs are 'inherently dangerous weapons for which no peaceful purpose can be seriously suggested, regardless of whether the weapons actually are used.'" *Newman*, 1997 WL 603740, at *1 (quoting *Dodge*, 846 F. Supp. at 184). In a case involving firebombs, the Eighth Circuit agreed with the *Newman* court's

31

finding of a "lack of a nonviolent purpose for a bomb and the fact that, by its very nature, there is a substantial risk that the bomb would be used against the person or property of another." *Drapeau*, 188 F.3d at 990. A panel of the Sixth Circuit reached the same conclusion in a per curiam decision, finding that "[p]ipe bombs are inherently dangerous and serve no useful purpose." *United State v. Cole*, 19 F.3d 19 (Table), 1994 WL 64697, at *3 (6th Cir. 1994). The judicial authorities are legion and unanimous: a pipe bomb serves no legitimate, non-criminal purpose.

The judicial assessment in this regard mirrors the views of Congress and law enforcement. Congress enacted a registration requirement for certain firearms it deemed "inherently dangerous and generally lacking usefulness, except for violent and criminal purposes." *Dunn*, 946 F.2d at 621; *see also United States v. Fields*, No. 05-1318, 2006 WL 1049654, at *4 (3d Cir. Apr. 21, 2006). "The legislative history of the Firearms Act indicates that it requires registration of objectively destructive devices, devices inherently prone to abuse and for which there are no legitimate industrial uses." *United States v. Cruz*, 492 F.2d 217, 219 (2d Cir. 1974); *see also United States v. Goldring*, 332 F.3d 838, 843 (5th Cir. 2003). Federal law enforcement authorities have acknowledged the specific threat posed by pipe bombs, testifying before Congress that "pipe bombs and firearms" have traditionally been regarded as "the favorite weapons of the terrorist." Patrick J. Daly, Assistant Special Agent in Charge, Chicago Division, FBI, Testimony before the House Committee on Governmental Reform, Subcommittee on Government Efficiency, Financial

32

Management, and Intergovernmental Relations: Counterterrorism (July 2, 2002), *available at* http://www.fbi.gov/congress/congress02/daly07022002.htm. One need only consider the prevalence of pipe bombs in the activities of domestic terrorists to appreciate the verity of this statement. *See generally* Brent L. Smith, *Terrorism in America: Pipe Bombs and Pipe Dreams* (1994) (describing the activities of terrorist groups operating in the United States from the 1960s through the 1990s).

Evidence presented at trial provides even further support for the conclusion that pipe bombs lack any legal purpose. The Government's expert, an officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives, testified that pipe bombs like those discovered in Hull's possession "would not have any social or cultural value." (App. at 1258.) He testified that "[t]here is no legitimate purpose for these devices," and that "[f]rom our perspective or from any reasonable person's perspective, they can simply be used as a weapon and nothing more." (*Id.* at 1258-59.) The expert elaborated that these pipe bombs "produce fragmentation and they are not good for any kind of useful work other than, of course, creating a weapon and injuring or killing people." (*Id.* at. 1261.) On cross examination, he rejected any notion that a pipe bomb could be used for farming purposes, such as removing stumps or rocks, because the power generated by an exploding pipe bomb "is insufficient to do any kind of useful work on a farm or otherwise," but "is enough to blow up the pipe, to throw fragments." (*Id.* at 1263.) At no time during trial did Hull refute this evidence.

33

For all of these reasons, there can be no serious dispute that a pipe bomb lacks any nonviolent or lawful purpose. It flows inexorably from this conclusion that when a person unlawfully possesses a pipe bomb, there is a substantial risk that he or she may put that pipe bomb to the use for which it was intended: to perpetrate physical force against the person or property of another.

### III.

None of the authorities cited in the majority's opinion compels a result contrary to the one I propose today. The majority discusses our recent decision in *Tran v. Gonzalez*. In *Tran*, a case which did not involve a pipe bomb, this Court held only that § 16(b) requires that the "use" of "physical force" be intentional, rather than merely reckless. 414 F.3d at 470. Intentional use of force is precisely the "substantial risk" that I believe arises when one unlawfully possesses a pipe bomb. Therefore, I find that *Tran* is fully consistent with the interpretation I propose today.

The majority also discusses *United States v. Bowers*, 432 F.3d 518 (3d Cir. 2005), another case that did not involve pipe bombs. In *Bowers*, we considered whether the crime of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), was a crime of violence within the meaning of 18 U.S.C. § 3142(g) and (f)(1)(A). We concluded that it was not. We found that "many, perhaps most" of the reasons why a felon might possess a firearm "do not involve likely accompanying violence." 432 F.3d at 521 (internal quotation marks omitted) (citing *United States v. Lane*, 252

34

F.3d 905, 906 (7th Cir. 2001), for the proposition that felons may use firearms for "self-defense, hunting, gun collecting, and target practice"). That reasoning simply does not apply here, where the possession of an unregistered pipe bomb has *no* lawful purpose. *See Drapeau*, 188 F.3d at 990 n.4 ("The offense of being a felon-in-possession of a firearm focuses on society's determination that certain individuals—felons—are unqualified to possess firearms, even for lawful purposes. The offense of unlawfully making a bomb, however, focuses on the inherent dangerousness of, and lack of a legitimate purpose for, the bomb itself." (citations omitted)).

The majority also cites *Bailey v. United States*, 516 U.S. 137 (1995), to suggest that "[t]he danger from a pipe bomb comes not from the offense of possession, but from the added factor of *use* of the pipe bomb." Maj. Op. at 12-13. In *Bailey*, the Supreme Court considered the meaning of the term "use" in 18 U.S.C. § 924(c)(1), a statute which specifies penalties for the "use" of a firearm during and in relation to a crime of violence. There, the Court held that "use" requires "active employment," rather than mere possession, of a firearm. *Id.* at 143. Although § 924(c)(1) and § 16(b) both employ variations of the word "use," the similarity stops there. The Court in *Bailey* had no occasion to consider what sort of conduct involves a substantial risk that physical force may be used against the person or property of another. Moreover, because I regard the possession of an unregistered pipe bomb to involve a substantial risk that physical force against another may be "actively employed" in the course of committing the offense of possession, I find *Bailey* entirely consistent with my proposed construction.

35

Finally, the majority draws support from *United States v. Lane*, in which the Seventh Circuit held that being a felon in possession of a firearm was not a crime of violence within the meaning of 18 U.S.C. § 3156(a)(4)(B). Aside from the obvious fact that decisions of the Seventh Circuit do not bind the Third Circuit, *Lane* did not involve a pipe bomb or other weapon lacking any significant lawful use—a fact expressly noted in the court's opinion. *See* 252 F.3d at 907 ("Some firearms, it is true—for example sawed-off shotguns— have no significant lawful use, and so their possession by felons may well constitute a crime of violence, as held in reference to the sentencing guidelines . . . . Our defendant is not accused of possessing such a weapon, however . . . ."). Therefore, *Lane* is distinguishable and non-binding.

In short, the majority's opinion makes new law. With today's holding, the Court steers a new course into largely uncharted waters. If the "mere" possession of a pipe bomb is not a crime of violence, then neither, it would seem, is the "mere" possession of an even more destructive implement. I do not believe that any of the precedents cited in the majority's opinion compel or warrant this result.

## IV.

Today, the Court holds that the "mere" possession of a pipe bomb is not a federal crime of violence. As I read this holding, the "mere" possession of a car bomb, or a landmine, or an explosive vest, or a "dirty bomb," or even a nuclear bomb, would also not constitute a crime of violence, because there would be no substantial risk that the possessor may use

36

physical force against another in the course of committing the offense of possession.  I cannot condone such a crabbed interpretation of § 16(b).  The "course" of committing the crime of possession includes the time that possession is obtained, the time that possession is relinquished, and all times in between.  In the course of possessing a pipe bomb, there is *always* a substantial risk that the possessor may intentionally (not accidentally) use physical force against the person or property of another.  The plain language of § 16(b), no less than common sense, dictates this result.

37