[No. B201294. Second Dist., Div. Five. Mar. 24, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE ALBERT REYES, JR., et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.B.–E.

## COUNSEL

Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant Jose Albert Reyes, Jr.

H. Clay Jacke II for Defendant and Appellant Miriam Ahamad.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Victoria B. Wilson and Michael R. Johnsen, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

TURNER P. J.—

## I. INTRODUCTION

Defendants, Jose Albert Reyes, Jr., and Miriam Ahamad, appeal from their convictions. Mr. Reyes was convicted of first degree murder (Pen. Code,[1] § 187, subd. (a)). As to Mr. Reyes, the jury found that a principal personally discharged a firearm which caused death. (§ 12022.53, subds. (b), (c), (d), (e)(1).) Ms. Ahamad was convicted of being an accessory after the fact. (§ 32.) As to both defendants, the jury also found their offenses were committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(A).) Mr. Reyes argues the trial court improperly denied his severance motion and admitted testimony from two Los Angeles Police Department experienced gang investigators. Mr. Reyes further argues there was insufficient evidence to support his conviction. Ms. Ahamad argues the trial court improperly found she did not have standing to move to suppress wiretap evidence and there was insufficient evidence the murder was committed for the benefit of a criminal street gang. We affirm.

## II. FACTUAL BACKGROUND

We view the evidence in a light most favorable to the judgment. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781]; *People v. Elliot* (2005) 37 Cal.4th 453, 466 [35 Cal.Rptr.3d 759, 122 P.3d 968]; *Taylor v. Stainer* (9th Cir. 1994) 31 F.3d 907, 908–909.) On May 31, 2004, Jose Martinez-Martinez, Marco Antonio Larrainzar, and Ray Chester met. They met in order to celebrate Mr. Chester's birthday. The three men went to a restaurant on Sixth Street in downtown Los Angeles, where they drank beer for approximately one hour. While at the restaurant, three men, who appeared to be Salvadoran or Guatemalan, told Mr. Martinez they hated Mexicans. Mr. Martinez and his companions left the restaurant. Thereafter, they went to El Pulgarcito restaurant on Vermont Avenue. The three men ordered bottled beer. Mr. Martinez left the restaurant briefly to watch a basketball game in an adjacent establishment. Later, Mr. Martinez rejoined his two companions at the same table. Approximately five Latino men were seated at another table in the restaurant. Mr. Reyes looked angrily at Mr. Chester more than seven times.

At some point, Mr. Larrainzar got up to play music and Mr. Martinez went to the restroom. A man in the restroom spoke to Mr. Martinez in Spanish.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

While in the restroom, Mr. Martinez was asked where he was from. Mr. Martinez responded that he was from Mexico. The individual said that he was from Guatemala. Mr. Martinez walked back into the restaurant. Mr. Martinez was confronted by another man in the hallway. The man asked Mr. Martinez: "Where are you from? If you're not going to tell me, I'm going to kill you." Mr. Martinez responded: "No, just go away. We're just celebrating my friend's birthday. What's going on?" The man said: "No, I'm not—I'm not joking. Just tell me where you're from or I'm going to kill you."

Mr. Chester became concerned when Mr. Martinez did not immediately return from the restroom. Mr. Chester walked up the steps to the hallway. Mr. Chester approached Mr. Martinez. Mr. Chester asked the man: "Hey, what happened? What's wrong with you? We're just celebrating my birthday." The man asked Mr. Chester, "What barrio, what hood are you from?" Mr. Chester responded, "From none." The man then punched Mr. Chester in the face. Mr. Chester fell down a nearby flight of stairs. Mr. Martinez was struck on the left side of the face by another person. Mr. Martinez was assaulted while being held from behind. Mr. Martinez feared that he was going to be killed. Both assailants were Latino.

Mr. Martinez and Mr. Chester then heard a gunshot. Mr. Chester then felt people jump over his body as several individuals ran out of the restaurant. Mr. Chester saw Mr. Martinez come from the kitchen. Mr. Chester and Mr. Martinez then found Mr. Larrainzar on the floor. Mr. Larrainzar was bleeding from the head. Mr. Martinez and Mr. Chester went outside to attempt to locate their assailants. However, it was dark and they saw no one. Thereafter, Mr. Chester and Mr. Martinez left the restaurant. Mr. Larrainzar later died as a result of a close contact gunshot wound to his head.

Nelly Weld was working as a waitress at the El Pulgarcito restaurant on May 31, 2004. At approximately 8:00 p.m., three Latino men entered the restaurant and sat at a middle table. The men ordered beer. Ten or 15 minutes later, another four Latino men walked into the restaurant. The men sat at two tables near the window. Ms. Weld had never seen any of the men in either group before. They also ordered beer. Ms. Weld noticed that one of the men seated at the middle table had a spider web tattoo on his elbow and a bald head. Ms. Weld associated these features with gangs. Ms. Weld was familiar with the fact there was a local gang in the area of the restaurant. Ms. Weld was the only waitress in the restaurant and an individual identified only as "Maritza" was the cook on May 31, 2004.

At some point, Ms. Weld went to the storage room to get beer for the cooler. While inside the storage room, Ms. Weld heard a gunshot. When Ms. Weld heard a commotion from the area leading to the restroom, she

entered the kitchen. Ms. Weld and the cook looked through the small window of the kitchen door. Ms. Weld then looked into the restaurant. Ms. Weld saw people leaving the restaurant. Ms. Weld saw the backs of the individuals who had been seated near the window as they went out the front door. Ms. Weld saw a wounded man inside the restaurant. Ms. Weld called the owner, Zoila Valdez, who was at another restaurant. At trial, Ms. Weld did not recall telling Ms. Valdez that two gang members, who were known by certain gang nicknames, shot someone in the restaurant. Ms. Weld did not recall telling Ms. Valdez that these men were the same gang members that had been "hanging out" at the restaurant for two weeks and causing problems. After speaking with Ms. Valdez, Ms. Weld then called the police. Ms. Weld locked the front door of the restaurant. Before the police arrived, Ms. Weld removed the beer bottles from the tables and placed them in the trash can.

Detective Mario Mota met with Ms. Valdez, the restaurant owner, at approximately 12:30 a.m. on June 1, 2004. Ms. Valdez had telephoned the police about the shooting. Ms. Valdez had received a telephone call from Ms. Weld about the shooting. Ms. Weld said gang members had shot someone. Only Ms. Weld and the cook were present at the time of the shooting. Ms. Weld explained to Ms. Valdez that the victim and a friend had come to the restaurant and began drinking and eating. This was the first time Ms. Weld had seen these individuals. Thereafter, two gang members had entered the restaurant and waited for the victim to go to the restroom. Ms. Weld then heard a gunshot. Ms. Weld also told Ms. Valdez the same gang members had gone to the restaurant for the past two weeks. Ms. Weld stated that Mr. Reyes and Mr. Aguilar were the individuals who had waited for the victim near the restroom. However, Ms. Weld used Mr. Reyes' and Mr. Aguilar's gang monikers in describing them to Ms. Valdez. Ms. Valdez knew both individuals and described them to Detective Mota. Ms. Valdez described Mr. Reyes utilizing three possible gang nicknames and said he lived directly across the street from the restaurant on Alvarado Boulevard. Ms. Valdez was very nervous, trembling, and reluctant to give information to Detective Mota. Ms. Valdez explained that she did not want to get involved because it was very dangerous to give out such information.

On a later date, Detective Mota interviewed Ms. Valdez again. Their discussion was tape-recorded. Ms. Valdez indicated that she did not want to be involved in the trial because she had been intimidated. However, she wrote down on a piece of paper two names. Mr. Reyes and Mr. Aguilar were known by the aliases supplied by Ms. Valdez. Ms. Valdez passed the piece of paper to Detective Mota on the counter and then took it back and crumpled it. At first, Ms. Valdez refused to look at photographic lineups containing photographs of the suspects. However, when Detective Mota placed them on the counter, she pointed at Mr. Reyes' photo. Ms. Valdez then went to the kitchen where she was seen shaking, crying, and wiping tears from her eyes.

Detective Mota encouraged Ms. Valdez to look at the photographic lineup containing Mr. Aguilar's picture. However, Ms. Valdez ran into the bathroom and locked the door.

When Detective Mota had interviewed Ms. Weld at the scene, she indicated the victims looked like "normal guys." However, she identified the other three individuals as those involved in the shooting. Ms. Weld stated that they were frequent customers or at least that she had seen them before.

Los Angeles Police Department Detective Jeff Breuer arrived at the homicide scene at approximately 11:45 p.m. Detective Breuer saw a Honda Accord and a 2004 Chevrolet Tahoe truck parked on the street and two Corona beer bottles on the sidewalk near the restaurant entrance. Once inside, Detective Breuer saw all the tables but one had apparently been cleared. One table was broken. Detective Breuer understood that the restaurant had been open when the shooting occurred and numerous customers had been inside. Inside a trash can, Detective Breuer found 14 Corona beer bottles, a few of which were full. Detective Breuer believed that someone had started to clean up the restaurant after the shooting. The kitchen was also clean. One expended bullet casing was found in the restaurant. At approximately 3:00 a.m., Detective Breuer learned that Ms. Ahamad, who was accompanied by two children, had requested access to a Chevrolet Tahoe. Department of Motor Vehicles records showed the Chevrolet Tahoe was registered to Mr. Aguilar on Normandie Avenue, which is approximately two miles from the El Pulgarcito restaurant.

At approximately 11:00 a.m. on June 1, 2004, Drug Enforcement Administration Special Agent Scott Wight contacted Detective Breuer. Agent Wight had obtained a federal court order to intercept and monitor Mr. Aguilar's mobile telephone. In the early morning hours of June 1, 2004, the authorities intercepted incoming and outgoing conversations on Mr. Aguilar's mobile phone which discussed a Los Angeles homicide. The substance of the intercepted conversations involved the restaurant shooting. The authorities continued to monitor Mr. Aguilar's mobile phone. Agent Wight provided information to Detective Breuer regarding the user of the phone. Agent Wight also provided information as to who Mr. Aguilar spoke to and the content of their conversations. The intercepted conversations were recorded on a compact disc, preserved, and transcribed for future use. A stipulation was read to the jurors that limited the application of the recording to Ms. Ahamad. A redacted copy of the recorded conversations was played at trial. A redacted transcript was provided for the jurors' use.

When Mr. Aguilar spoke with Ms. Ahamad, he mentioned that he left an empty cardboard six-pack in the restaurant. An empty Corona beer six-pack

was found in the restaurant by Detective Breuer. Nineteen monitored calls between Mr. Aguilar and Ms. Ahamad were made between 9:41 a.m. and 3:38 p.m. Ms. Ahamad and Mr. Aguilar discussed: the shooting at El Pulgarcito; the victim's death; witnesses; possible identifications; and the fact that Ms. Ahamad was able to drive away with the Chevrolet Tahoe. Ms. Ahamad discussed arrangements for Mr. Aguilar to get false identification and $15,000. In addition, Ms. Ahamad admitted having someone speak to Ms. Weld. Ms. Ahamad was able to find out what Ms. Weld told the police. Ms. Ahamad later told Mr. Aguilar about a discussion with Ms. Weld. Ms. Weld indicated that she had not revealed the identification of anyone to the police and would not do so in the future. Ms. Ahamad informed Mr. Aguilar that Ms. Weld was shown a photo album, and took the empty beer bottles at the murder scene that had been thrown in the trash.

Ms. Ahamad made arrangements to meet Mr. Aguilar at a Walgreens drugstore parking lot at Sixth Street and Vermont Avenue to give him some clothes. Ms. Ahamad told Mr. Aguilar: "But I'm going to tell you something. Since it was a gang thing they're going to start looking for cholos and you know that Blackie and all those guys are snitches, Raul. All they have to do is say your nickname and everything goes to shit."

The police watched an apartment building on Westlake Avenue where Ms. Ahamad resided. Agent Wight had given information to the police officers regarding that address. The police knew that Ms. Ahamad and Mr. Aguilar lived together. The police also watched a residence on South Alvarado, where Mr. Reyes's wife, Yatsmin Aguilar Reyes, resided. Ms. Reyes was Mr. Aguilar's sister. At approximately 12:45 p.m. on June 1, 2004, Officer Lance Jurado observed Ms. Ahamad get out of a silver Honda registered to the Reyeses. At approximately 3:00 p.m. Officer Jurado saw Ms. Ahamad walk out of the apartment building, enter a silver Honda, and drive away. Immediately thereafter, the silver Honda registered to the Reyeses appeared behind the first car and followed them. Yatsmin Aguilar was driving the second car.

Lieutenant Peter Zarcone followed the two silver Hondas in the direction of Sixth Street and Vermont Avenue. Lieutenant Zarcone had learned that this neighborhood was to be a meeting point for Mr. Aguilar. Lieutenant Zarcone drove a different route to the area across from the drugstore parking lot at that intersection. Detective Breuer was notified at approximately 3:30 p.m. on June 1, 2004, that the location of Sixth Street and Vermont Avenue was to be monitored. Lieutenant Zarcone saw Mr. Aguilar drive into the parking lot in a black Nissan. Mr. Aguilar stopped his car in a parking space. One of the Hondas parked adjacent to Mr. Aguilar. The occupant of the Honda spoke briefly with Mr. Aguilar. The three cars then drove out of the parking lot. Mr. Aguilar drove out of the parking lot and was arrested shortly thereafter.

At approximately 6:20 p.m. on June 1, 2004, Ms. Ahamad telephoned Detective Mota. Ms. Ahamad asked Detective Mota if she could bring her son to see Mr. Aguilar for the last time. Mr. Aguilar was Ms. Ahamad's son's father. When asked why she would assume that they would not see Mr. Aguilar again, Ms. Ahamad responded that she just "knows those things." Detective Mota told Ms. Ahamad that Mr. Aguilar would soon be released. Mr. Aguilar was released approximately an hour later. Mr. Aguilar's mobile telephone was returned to him. Police officers hoped to get more information from conversations on the monitored phone.

On June 7, 2004, Mr. Martinez met with Detective Mota. Mr. Martinez gave a description of the three men who confronted him in the restaurant bathroom and hallway. Mr. Martinez was shown a photographic lineup by Detective Mota. Mr. Martinez selected Mr. Aguilar as looking like the individual in the bathroom. Mr. Martinez was shown another photographic lineup some time later. Mr. Martinez identified Mr. Reyes as the second individual. Mr. Martinez also identified Mr. Reyes at trial. Mr. Martinez was 90 percent certain of the identification of Mr. Reyes.

Mr. Chester was also interviewed by Detective Mota. Mr. Chester was shown a photographic lineup. As noted above, Mr. Chester was asked where he was from and was punched. Mr. Chester selected Mr. Aguilar from the photographic lineup. Mr. Chester was 90 percent certain about his identification. Mr. Chester met with Detective Mota on June 10, 2004 and was shown another photographic lineup. Mr. Chester identified Mr. Reyes as one of the assailants. Detective Mota described Mr. Chester's comments while reviewing the photographic lineup, "He basically told me that number 4 . . . he definitely recalled seeing him inside the restaurant, seated to his right across from him . . . staring at him and giving him dirty looks while he was in that restaurant." Mr. ·Reyes' picture was in position No. 4 in the photographic lineup.

Roy Sandt was homeless and often lived in his car behind the El Pulgarcito restaurant in 2004. Mr. Sandt often emptied the trash for the restaurant between 8:30 and 10:00 p.m. In return, the restaurant owner, Ms. Valdez, would save bottles and cans for him to recycle. On May 31, 2004, Mr. Sandt saw the cook at the backdoor of the restaurant. She was very distraught and on the verge of crying. Mr. Sandt stepped inside, where he saw Ms. Weld in the dining room on the other side of the kitchen pass-through window. Ms. Weld looked "like she was freaking out" in Mr. Sandt's words. Mr. Sandt decided to leave.

On July 13, 2004, Mr. Sandt spoke to Detective Julian Pere about the incident. Detective Pere wrote down the information provided by Mr. Sandt.

Detective Pere had Mr. Sandt read and sign the statement. Mr. Sandt identified Mr. Aguilar and Mr. Reyes utilizing their gang monikers. Mr. Sandt described Mr. Aguilar as a white man over six feet tall with dark hair and a stocky build and goatee. Mr. Sandt said Mr. Aguilar drove a white sport utility truck which frequented the area of Seventh and Alvarado Streets. At trial, Mr. Sandt recalled identifying Mr. Aguilar to Detective Pere. However, at trial, Mr. Sandt did not recall a specific gang moniker which appeared on the piece of paper to which he affixed his signature. Mr. Sandt identified Mr. Aguilar from a photographic lineup. But, as always, Mr. Sandt utilized Mr. Aguilar's gang moniker. Mr. Sandt also identified Mr. Reyes as the person using a specific gang moniker from another photographic display. Detective Pere contacted Mr. Sandt by telephone on a later date regarding testifying in this case. Mr. Sandt said he would be killed if he testified regarding the information in his signed statement.

Mr. Reyes was arrested on November 6, 2004. Ms. Ahamad was arrested on November 19, 2004. Ms. Ahamad was carrying $1,823 in cash at that time. Mr. Aguilar was arrested in Oakland, California on September 22, 2005. At the time of his arrest, Mr. Aguilar had several forms of identification depicting his photograph. But the name on the papers was Carlos Ramirez. Mr. Aguilar died before trial commenced.

Lieutenant Zarcone was assigned to the criminal street gang unit in the early 1990's with specific responsibility for the local gang to which defendants belonged. Thereafter, he supervised three gang units. Lieutenant Zarcone monitored the local gang closely and arrested many of its members. Lieutenant Zarcone had spoken to Mr. Reyes on four or five occasions. Lieutenant Zarcone knew Mr. Reyes to be a member of the local gang. Lieutenant Zarcone was aware that Mr. Reyes's four brothers were all members of the local gang. Lieutenant Zarcone knew a local gang member who is Mr. Reyes's younger brother. Mr. Reyes's girlfriend, Ms. Aguilar, is Mr. Aguilar's sister. Ms. Ahamad was also a member of the local gang. Ms. Ahamad lived with Mr. Aguilar. During the 1990's there were quite a few women involved in the local gang.

Officer Danny Arrona had been assigned to the gang unit for four and one-half years at the time of trial. Officer Arrona had grown up in an area known for gangs. Officer Arrona was familiar with gang hangouts, rivalries, tattoos, graffiti, and vandalism. Officer Arrona had hundreds of conversations with gang members and attended national gang conferences. Officer Arrona had previously testified in court regarding the local gang in this case. In 2004, the local gang dominated in the MacArthur Park area. There were 120 to 140 members in the gang at that time. The local gang had symbols and signs to identify membership which were used in graffiti. Individuals joined the gang

by being "jumped in" or by committing a violent act or crime. Most gang members are in the gang for life, unless they move away forever or are "jumped out." Gang members often have visible tattoos that serve to intimidate others in the neighborhood. Both Ms. Ahamad and Mr. Reyes had several gang-related tattoos.

Officer Arrona had seen Ms. Ahamad in the area where the local gang congregated in 2004. Officer Arrona was also familiar with Mr. Reyes from the local gang. Mr. Reyes used a gang moniker. Officer Arrona testified that the activities of the local gang included: murders; robberies; carjacking; vandalism; and narcotics sales. Officer Arrona cited numerous predicate offenses committed by specific local gang members.

The El Pulgarcito restaurant is situated within the local gang territory. When rival gang members are encountered in the local gang's territory, violence is likely to occur. This allows the local gang to assert their authority in the area as well as pursue their criminal activities. When approaching others in their territory, the local gang member usually inquires, "Where are you from?" When posed with a hypothetical situation similar to what occurred in this case, Officer Arrona opined that the gang members worked together to challenge the victims. Moreover, the murder would serve to enhance the reputation of both the individuals and the gang in general within the community. Officer Arrona believed when a gang member removed an automobile from the scene of a crime, they were in effect removing evidence. Efforts to secure money, clothing, and an alternate automobile for an individual involved in a shooting would serve to help not only the gang member but the gang itself.

## III.  DISCUSSION

### A.  Ms. Ahamad's Suppression Motion

#### 1.  Factual and procedural background

Ms. Ahamad argues that the trial court improperly held that she did not have standing to object to the wiretap evidence. Prior to trial, Ms. Ahamad filed a section 1538.5 motion to suppress her conversations with Mr. Aguilar. The conversations were intercepted pursuant to a federal court-ordered wiretap of Mr. Aguilar's telephone in an unrelated matter.

The basis of Ms. Ahamad's suppression motion was that the federal agents failed to comply with "minimization" and "spot monitoring" requirements imposed by title 18 United States Code section 2518(5). Ms. Ahamad's

moving papers stated: "The federal order authorizing the electronic surveillance was subject to the process of 'minimization.' It was required that all monitoring of wire communications shall be in accordance with the minimization requirement of 18 USC § 2518(5). However, even if a conversation is minimized, 'spot' monitoring may be conducted to ascertain whether or not the conversation has become criminal in nature or is no longer privileged." Later, Ms. Ahamad's moving papers asserted: "In the present investigation, virtually all the calls reported by the federal agents to be involved in the killing . . . were personal telephone calls in which matters not related to drug trafficking were discussed. One reads the conversations and it is difficult to imagine that in the course of an investigation involving a large drug trafficking organization . . . that one could not realize that [Mr. Aguilar] and Ms. Ahamad] were discussing events totally unrelated to drug sales. . . . Yet, the government continued to listen, minimizing very little, if any, of the calls which clearly had nothing to do with drug transactions." We will discuss the substance of the minimization and spot monitoring requirements imposed by federal law in detail later in this opinion.

At the hearing on the motion, H. Clay Jacke II, Ms. Ahamad's attorney, argued that she did not have to be a target of the wiretap to have standing to object to the use of the conversations as evidence against her. The trial court agreed with the prosecutor's argument that because the wiretap of Mr. Aguilar's cellular phone was federally authorized, California authority does not apply. The trial court noted that although it was willing to go forward as to Mr. Aguilar's suppression motion: "I think Ms. Ahamad is in a very, very different scenario. She is not a target. There is no claim of ownership of the phone. There is no claim of possession of the interests of the phone. Her voice simply seems to be captured. And that, even in a conservative approach, is a very different situation than Mr. Aguilar. [¶] [The prosecutor] may argue they are exactly the same. He may be correct, but I see a distinction. And at least as far as Ms. Ahamad is concerned, unless and until Ms. Ahamad, through competent evidence, can show she has requisite legitimate expectation of privacy, the court is not prepared to go to merits as to so-called necessity and other factors, minimization as to Ms. Ahamad." After a lengthy recess to allow Mr. Jacke to conduct further research and argument on the issue, the trial court held: "I sustain the People's position. I believe that Ms. Ahamad has not established her threshold of legitimate expectation of privacy in any of the conversations in any of the tapes, and any phone that is involved and, therefore, is not in a position to be going forward. So the court denies to Ms. Ahamad the 1538.5 [motion]." Mr. Aguilar then withdrew his section 1538.5 motion.

## 2. The trial court's erroneous standing ruling does not require a reversal and resumption of the suppression of evidence hearing

Our Supreme Court explained in *People v. Woods* (1999) 21 Cal.4th 668, 673–674 [88 Cal.Rptr.2d 88, 981 P.2d 1019]: "As the finder of fact in a proceeding to suppress evidence (Pen. Code, § 1538.5), the superior court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally unreasonable. (*People v. Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) Accordingly, in reviewing the instant suppression order, we consider the record in the light most favorable to [respondents] since 'all factual conflicts must be resolved in the manner most favorable to the [superior] court's disposition on the [suppression] motion.' (*People v. Martin* (1973) 9 Cal.3d 687, 692 [108 Cal.Rptr. 809, 511 P.2d 1161].) But while we defer to the superior court's express and implied factual findings if they are supported by substantial evidence, we exercise our independent judgment in determining the legality of a search [based] on the facts so found. (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729]; *People v. Lawler, supra,* 9 Cal.3d at p. 160.)" (See also *People v. Roybal* (1998) 19 Cal.4th 481, 506–507 [79 Cal.Rptr.2d 487, 966 P.2d 521]; *People v. Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221]; *People v. Siripongs* (1988) 45 Cal.3d 548, 567 [247 Cal.Rptr. 729, 754 P.2d 1306].)

■ Title III of the federal Omnibus Crime Control and Safe Streets Act of 1968 provides a "comprehensive scheme" for the regulation of wiretapping. (*Gelbard v. United States* (1972) 408 U.S. 41, 46 [33 L.Ed.2d 179, 92 S.Ct. 2357]; *People v. Leon* (2007) 40 Cal.4th 376, 384 [53 Cal.Rptr.3d 524, 150 P.3d 207].) Because the wiretap authorization was issued by a federal court, we analyze the suppression of evidence issue by reference to a substantive federal law. It is unlawful for anyone to intercept or attempt to intercept any wire, oral, or electronic communication "[e]xcept as otherwise specifically" permitted by other provisions of the statute. (18 U.S.C. § 2511(1)(a).) Our Supreme Court has expressly addressed the issue of whether a person whose conversations are intercepted pursuant to a wiretap order issued by a federal court may litigate a section 1538.5 suppression of evidence motion in state court: "The [Omnibus Crime Control and Safe Streets] Act also provides the means for invoking the suppression sanction. 'Any aggrieved person in any trial, hearing, or proceeding in or before any court . . . of the United States, a State or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—[¶] (i) the communication was unlawfully intercepted . . . .' (18 U.S.C. § 2518(10)(a).) The Act defines an 'aggrieved person' as one 'who was a

party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed.' (18 U.S.C. § 2510(11).) [¶] As parties to the taped conversations, both defendants here clearly meet the statutory definition of 'aggrieved person.' Therefore, defendants had standing to move for suppression pursuant to 18 United States Code section 2518(10)." (*People v. Otto* (1992) 2 Cal.4th 1088, 1098 [9 Cal.Rptr.2d 596, 831 P.2d 1178]; see *Bunnell v. Superior Court* (1994) 21 Cal.App.4th 1811, 1818 [26 Cal.Rptr.2d 819].) Title 18 United States Code section 2518(10)(a)(i) and (iii)[2] permit an aggrieved person to move to suppress the contents of an intercepted communication on the grounds it was unlawfully intercepted or the eavesdropping was not conducted in conformity with the federal court's orders. The Attorney General concedes that Ms. Ahamad, as a participant in the intercepted conversations, may move to suppress them.

■ As noted, Ms. Ahamad contends that the federal agents failed to comply with the minimization and spot monitoring requirements imposed by title 18 United States Code section 2518(5) which states in part: "Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days. In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception." Spot monitoring is a component of the statutorily mandated minimization duty imposed by title 18 United States Code section 2518(5) and routinely appears in federal electronic interception authorizations. Spot monitoring occurs during the interception of a nonpertinent conversation. The listener is permitted to renew listening of a nonpertinent conversation, i.e., spot monitor, in order to determine if its character has changed. (See *United States v. Ramirez* (10th Cir. 2007) 479 F.3d 1229, 1235 & fn. 2, overruled on another point in *Garrison v. Ortiz* (10th Cir. 2008) 296 Fed.Appx. 724, 726; *United States v. Mesa-Rincon* (10th Cir. 1990) 911 F.2d 1433, 1441–1442.)

The United States Supreme Court has explained the minimization requirement does not forbid the interception of conversations unrelated to the specific reason the warrant was issued. Rather, title 18 United States Code

---

[2] Title 18 United States Code section 2518(10)(a)(i) and (iii) state in part: "Any aggrieved person in any trial, hearing, or proceeding in or before any court . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—[¶] (i) the communication was unlawfully intercepted [¶] . . . or [¶] (iii) the interception was not made in conformity with the order of authorization or approval."

section 2518(5) requires the surveillance be conducted in such a manner as to "minimize" the interception of such conversations. (*Scott v. United States* (1978) 436 U.S. 128, 140 [56 L.Ed.2d 168, 98 S.Ct. 1717]; *United States v. Hull* (3d Cir. 2006) 456 F.3d 133, 142–143.) The Supreme Court in *Scott v. United States, supra,* 436 U.S. at page 140 explained: "The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations. Whether the agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case." (Accord, *United States v. Hull, supra,* 456 F.3d at p. 142.) As in other areas of privacy analysis, the controlling question is whether the intercepting authorities acted reasonably. (*Scott v. United States, supra,* 436 U.S. at p. 137; *United States v. Hull, supra,* 456 F.3d at p. 142.)

A court reviews a variety of factors in determining whether the authorities minimized the interception of communications unrelated to the justification for the issuance of the warrant. For example, where there is uncertainty as to the scope of the conspiracy, depending on the circumstances, more extensive surveillance may be reasonable. When the conspiracy is vaster, more intensive interception may be reasonable. Also, less adherence to minimization requirements is required in the case of conversations between coconspirators. If a public telephone is tapped, doubts as to compliance with minimization restrictions may arise if every call is listened in on by the authorities. Additionally, when the interception is occurring at the outset of the authorized surveillance period, it conceivably may be reasonable to listen in on every communication. Later in the surveillance, there may be categories of calls which are unrelated to the investigation and, consistent with the minimization requirement, should not be listened in on by the authorities. On the other hand, there may be circumstances where no nonpertinent patterns of calls arise and it may be reasonable to listen in on every telephone conversation. Further, in the cases of telephone calls made in code, where the conspirators begin to use aliases, or where ambiguous language is used, law enforcement officials may reasonably reduce their efforts at minimization. (*Scott v. United States, supra,* 436 U.S. at pp. 140–141; *In re Terrorist Bombings, U.S. Embassies, E. Africa* (2d Cir. 2008) 552 F.3d 157, 176; *United States v. Fernandez* (9th Cir. 2008) 526 F.3d 1247, 1251–1252; *In re Sealed Case* (Foreign Int.Surv.Ct.Rev. 2002) 310 F.3d 717, 741.) In conducting judicial review, some federal courts refuse to even consider a call which lasts less than two minutes in ruling on a minimization claim by the accused. This is because an intercepting agent cannot reasonably be expected to determine whether the call is nonpertinent in such a short time period. (*United States v. Yarbrough* (10th Cir. 2008) 527 F.3d 1092, 1098; *United States v. Dumes* (7th Cir. 2002) 313 F.3d 372, 380.)

■ Under federal law, the burden of demonstrating compliance with the minimization restriction is on the prosecution. (*United States v. Torres* (9th Cir. 1990) 908 F.2d 1417, 1423; *United States v. Rizzo* (2d Cir. 1974) 491 F.2d 215, 217, fn. 7 ["The United States Attorney must be prepared to sustain that burden even in a case where the defense is unprepared or chooses not to present its own evidence on the issue."].) The Tenth Circuit has developed the following burden-shifting process for adjudicating minimization claims. The initial burden rests with the government to show reasonable minimization efforts occurred by considering the factors discussed in *Scott v. United States, supra,* 436 U.S. at pages 140–141. (*United States v. Yarbrough, supra,* 527 F.3d at p. 1098; *United States v. Willis* (10th Cir. 1989) 890 F.2d 1099, 1102.) The burden then shifts to the defendant to show more effective minimization could have taken place; i.e., the authorities acted unreasonably. (*Scott v. United States, supra,* 436 U.S. at pp. 140–141; *United States v. Armocida* (3d Cir. 1975) 515 F.2d 29, 45.)

In this case, no initial minimization showing was made by the prosecution as the trial court ruled Ms. Ahamad had no standing to proceed. And Mr. Aguilar then withdrew his suppression of evidence motion. Thus, the prosecutor presented no evidence on the minimization issue. Typically, unless there is a harmless error question, an erroneous standing ruling requires the judgment be reversed and the suppression of evidence hearing be resumed. (*People v. Brooks* (1980) 26 Cal.3d 471, 483 [162 Cal.Rptr. 177, 605 P.2d 1306]; *People v. Dachino* (2003) 111 Cal.App.4th 1429, 1433 [4 Cal.Rptr.3d 691].)

However, we conclude Ms. Ahamad is not entitled to a reversal and resumption of the suppression of evidence hearing because her sole asserted ground—there was a minimization violation—has no merit. The sole ground asserted in Ms. Ahamad's section 1538.5 motion points and authorities was that the intercepted conversations had nothing to do with the initial justification for issuance of the wiretap warrant, a federal drug trafficking investigation. She reasoned the intercepted conversations involved the killing of Mr. Larrainzar and were entirely unrelated to the drug trafficking investigation. This contention has no merit as matter of law.

■ Title 18 United States Code section 2517(5)[3] expressly permits federal law enforcement officials to disclose the contents of intercepted

[3] Title 18 United States Code section 2517(5) states: "When an investigative or law enforcement officer, while engaged in intercepting wire, oral, or electronic communications in the manner authorized herein, intercepts wire, oral, or electronic communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent

communications involving offenses other than those specified in the federal judge's authorization or approval. (*United States v. London* (1st Cir. 1995) 66 F.3d 1227, 1234–1235; *In re Grand Jury Subpoena Served on Doe* (2d Cir. 1989) 889 F.2d 384, 387; *United States v. Angiulo* (1st Cir. 1988) 847 F.2d 956, 980.) An Eleventh Circuit Court of Appeals panel has explained: "Congress adopted section 2517(5) because it 'wished to assure that the Government does not secure a wiretap authorization order to investigate one offense as a subterfuge to acquire evidence of a different offense for which the prerequisites to an authorization order are lacking.' *United States v. Campagnuolo* 556 F.2d 1209, 1214 (5th Cir. 1977)." (*United States v. Van Horn* (11th Cir. 1986) 789 F.2d 1492, 1503.) Ms. Ahamad never sought a hearing based on the claim federal law enforcement authorities utilized the drug trafficking warrant as a stratagem to discover evidence relating to the shooting of Mr. Larrainzar. Nor did Ms. Ahamad challenge the federal court disclosure orders which resulted in the Los Angeles homicide detectives learning of the ongoing federally authorized electronic surveillance.

■ As a result, Ms. Ahamad is not entitled to a resumed hearing on her minimization claims. Ms. Ahamad's sole argument in her suppression of evidence motion points and authorities was that since the challenged conversations clearly did not involve drug trafficking, they could not be intercepted and disclosed and they should therefore be suppressed. As noted, title 18 United States Code section 2517(5) provides otherwise. Thus, Ms. Ahamad failed to raise a concrete litigable issue in her moving papers concerning other aspects of the minimization obligation imposed by title 18 United States Code section 2518(5). And she is not now entitled to a reversal and resumed section 1538.5 hearing notwithstanding the trial court's incorrect ruling on the standing issue. (*United States v. Migely* (1st Cir. 1979) 596 F.2d 511, 513; *Cohen v. United States* (9th Cir. 1967) 378 F.2d 751, 761.) A motion to suppress must be supported by points and authorities which set forth the factual basis and legal authorities which require suppression of the evidence. (§ 1538.5, subd. (a)(2) ["A motion pursuant to paragraph (1) shall be made in writing and accompanied by a memorandum of points and authorities . . . [which] shall set forth the factual basis and the legal authorities that demonstrate why the motion should be granted"]; *People v. Williams* (1999) 20 Cal.4th 119, 135 [83 Cal.Rptr.2d 275, 973 P.2d 52].) Our Supreme Court has held that a defendant must specify in the moving papers the precise grounds for the suppression of evidence motion. (*Williams*, at p. 135; *People v. Smith* (2002) 95 Cal.App.4th 283, 295–296 [115 Cal.Rptr.2d 483].) Ms. Ahamad's papers raised no issues concerning other potential minimization violations.

jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter [18 U.S.C. § 2510 et seq.] Such application shall be made as soon as practicable."

Finally, Ms. Ahamad argues there was a violation of the spot monitoring limitations in the federal court order. However, Ms. Ahamad's spot monitoring assertion in the trial court was the same as her minimization contention. According to Ms. Ahamad's moving papers, after the authorities heard about the killing of Mr. Larrainzar, spot monitoring restrictions were disregarded. However, as noted, title 18 United States Code section 2517(5) authorizes interception and disclosure of intercepted conversations concerning other crimes. Thus, no further hearing is warranted.

B.–E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV.   DISPOSITION

The judgments are affirmed.

Armstrong, J., and Kriegler, J., concurred.

Appellants' petition for review by the Supreme Court was denied June 24, 2009, S172067.

---

*See footnote, *ante*, page 671.